*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| COOK INLET FISHERMAN'S FUND, | ) | |
| | ) | Supreme Court No. S-15595 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-08259 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FISH & GAME, | ) | No. 7056 – September 25, 2015 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Bruce B. Weyhrauch, Gayle Horetski, Larri Irene Spengler, Law Office of Bruce B. Weyhrauch, LLC, Juneau, for Appellant. Michael G. Mitchell, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

WINFREE, Justice.

I.      INTRODUCTION

Alaska's Upper Cook Inlet fishery accommodates many resource users. Relevant to this appeal, set net and drift net commercial fishers both target sockeye salmon returning to the Kasilof and Kenai Rivers. The 2013 commercial fishing season in the Upper Cook Inlet saw strong sockeye salmon runs, but the Kenai River king

salmon run was the weakest on record. The Alaska Department of Fish and Game (Department) regulates commercial and sport fishing. Attempting to achieve the minimum escapement goal for Kenai River kings while also keeping the strong sockeye run in check, and recognizing that set netters' incidental harvest of those kings posed a greater risk to the king run than did drift netters' substantially smaller incidental harvest, the Department's Commissioner (Commissioner) used her emergency order authority to limit time for and then close the set net fishery while also increasing the drift net fishery time.

The set netters filed suit and sought an emergency preliminary injunction to re-open their fishery. The superior court declined to issue an injunction. The set netters amended their complaint to request a declaratory judgment recognizing the validity of the Board of Fisheries' (Board) management plans and a permanent injunction directing the Department to follow those plans. They also sought damages, asserting constitutional claims and a claim for negligent or willful fisheries mismanagement. The superior court granted summary judgment in full to the Department and assessed an attorney's fees award against the set netters, who now appeal both orders. Because there are no genuine issues of material fact and the Department is entitled to judgment as a matter of law, we affirm the grant of summary judgment. Because we see no abuse of discretion in the superior court's attorney's fees award, we affirm that award as well.

## II. FACTS AND PROCEEDINGS

### A. Facts

Cook Inlet Fisherman's Fund (CIFF) represents commercial fishers in the Cook Inlet fishery, including both set net and drift net fishers. The Cook Inlet fishery accommodates commercial, sport, personal, and subsistence users, and is a complex and crowded fishery. All five Pacific salmon species make their way through Cook Inlet and into its numerous river systems, including the Kasilof and Kenai Rivers.

## 1. Overview of the 2013 sockeye and king salmon commercial fishery in Upper Cook Inlet

The Department manages salmon stocks to achieve certain escapement ranges.[1] According to a Department scientist the upper and lower limits of a range represent numbers of spawning salmon which should produce the same sustained yield.[2]

In 2013 the Kasilof River sockeye run was particularly robust — by June 29 the run was at record strength and on July 23 the run had exceeded the Department's upper escapement goal of 390,000 fish by more than 40,000. By August 7 nearly 490,000 sockeye had escaped into the Kasilof River. Although the Kenai River sockeye run began at an average level, it increased throughout the season and eventually exceeded the upper escapement goal of 1,200,000 fish by nearly 160,000.

By contrast the 2013 Kenai River king run was weak. Kenai River kings return during an early run in May and June and a late run in July and early August. Since 1986 the Kenai River king run never has failed to exceed the Department's minimum escapement goal, but according to the Department the "Kenai River [kings] are experiencing a period of lower abundance, with the 2013 run being one of the lowest

---

[1] *See* 5 Alaska Administrative Code (AAC) 39.222(c)(2) (2015); *see also id.* (f)(10) (defining escapement as "the annual estimated size of the spawning salmon stock"). For example Kasilof River sockeye have an escapement range of 160,000-390,000, and the late-run Kenai River kings have an escapement range of 15,000-30,000. 5 AAC 21.365(b); 5 AAC 21.359(b). The management plans at issue have been amended since the 2013 commercial fishing season, but none of the amendments impact the provisions involved in our analysis. We therefore refer to the current management plans.

[2] Sustained yield "denotes conscious application insofar as practicable of principles of management intended to sustain the yield of the resources being managed." *West v. State, Bd. of Game*, 248 P.3d 689, 695 (Alaska 2010) (quoting RESOURCES COMMITTEE, ALASKA CONSTITUTIONAL CONVENTION, TERMS (1955)).

on record." The 2013 Kenai River king early run was "possibly the lowest run on record," and the late run "was the lowest on record."

The Department's historical data for late-run Kenai River king commercial harvest rates shows that although both set and drift netters primarily target sockeye, between 1986 and 2012 set netters incidentally harvested almost 14 times more late-run Kenai River kings than did drift netters. Another report shows that from 1966 to 2012 drift netters on average harvested only 6.4% of Upper Cook Inlet commercial kings, while set netters harvested the remaining 93.6%.

### 2. Salmon management regulations and the Commissioner's 2013 emergency orders

By regulation both set and drift netters in the Cook Inlet area may fish from seven in the morning until seven at night on Mondays and Thursdays.[3] But as an area management biologist for the Department's commercial fisheries division testified at the preliminary injunction hearing: "In the various management plans the Board has provided the Department with the option of fishing more time to increase the harvest or to slow down the rate of escapement that is . . . going into the various rivers."

For example when the Kenai River sockeye late-run strength is between 2,300,000 and 4,600,000 fish, "the commissioner may, by emergency order, allow extra [set net] fishing periods of no more than 51 hours per week" in the commercial fishing waters at issue here.[4] The late-run strength was at such a level in 2013. The Commissioner also may open supplemental set net fishing periods of up to 48 hours per

---

[3]     5 AAC 21.320(a), (b).

[4]     5 AAC 21.360(c)(2)(B). These waters include commercial fishing areas near the mouths of the Kasilof and Kenai Rivers.

week in the Kasilof River sockeye fishery,[5] but on and after July 8 this fishery is governed by the 51-hour discretionary rule.[6] On the other hand drift netters may be allowed an extra 12 discretionary fishing hours only between July 9 and July 15.[7] The Upper Cook Inlet management plan governing both drift and set net fishing provides:

> Notwithstanding any other provision of this chapter, it is the intent of the board that, while in most circumstances the department will adhere to the management plans in this chapter, no provision within a specific management plan is intended to limit the commissioner's use of emergency order authority . . . to achieve established escapement goals for the management plans as the primary management objective.[8]

According to the December 2013 Upper Cook Inlet Commercial Fisheries Annual Management Report, 2013 was a unique year: "The continued poor performance of the Kenai River late-run [king] salmon return combined with an above average sockeye salmon return led to an atypical management strategy during late July." To account for these disparate run strengths, the Commissioner took the following actions during the 2013 commercial fishing season.

For the week of June 23, although 48 discretionary fishing hours were potentially available to some set netters, the Commissioner added only 2 hours. For the

---

[5]    5 AAC 21.365(c)(2)(A).

[6]    5 AAC 21.365(c)(2)(A), (3).

[7]    *See* 5 AAC 21.353(c)(2).

[8]    5 AAC 21.363(e) (Upper Cook Inlet Salmon Management Plan), *cited by* 5 AAC 21.353(c) (am. 6/12/2011) (Central District Drift Gillnet Fishery Management Plan), 5 AAC 21.359(h) (am. 6/1/2013) (Kenai River Late-Run King Salmon Management Plan), 5 AAC 21.360(j) (am. 5/21/2011) (Kenai River Late-Run Sockeye Salmon Management Plan), and 5 AAC 21.365(g) (am. 5/21/2011) (Kasilof River Salmon Management Plan).

next week, although 48 discretionary fishing hours were potentially available to some set netters, the Commissioner added only 16 hours. For the week of July 7, although 51 discretionary fishing hours were potentially available to some set netters, the Commissioner added only 8 hours. That same week, drift netters fished an additional 12 hours.

During the week of July 14 the Commissioner opened some set net fishing for 18 additional hours, but drift netters were allowed an additional 42 hours. For the week of July 21 one regular 12-hour set net fishing day was closed, but drift netters fished their two regular 12-hour periods. The emergency order stated:

> As of July 22, indices used to assess inriver abundance indicate a king salmon run that is below average. . . . At the current rate of harvest, the projected [Kenai River late-run king salmon] escapement will be below the [sustainable escapement goal]. . . .
>
> Therefore, limiting the harvest of king salmon in the . . . set gillnet fishery is warranted in an effort to achieve the [sustainable escapement goal]. No more than one 12-hour [set net] fishing period per management week (Sun-Sat) will be allowed.

On July 28 the Commissioner closed the set net fishery " 'until further notice' in response to projections that the Kenai River late-run of [king] salmon may not achieve the minimum [sustainable escapement goal]." Because the late-run Kenai River kings appeared unlikely to exceed the minimum escapement goal, the set net fishery remained closed through the end of the season. While the set net fishery remained closed, drift netters fished multiple regular 12-hour periods between July 28 and August 15, the end of the major commercial fishing season.

The Department's 2013 post-season preliminary data indicated the Kenai River late-run kings minimum escapement goal of 15,000 was exceeded by only about

400 salmon. As the Department noted in its December 2013 post-season management report:

> As in 2012, poor performance of the early- and late-runs of [king] salmon into the Kenai River led to very conservative management of the set gillnet fishery, and ultimately a closure . . . . [T]he management approach . . . created a disparity in the harvest and opportunity between the two gear groups [set and drift netters] that normally does not exist.

Drift netters caught about 62% of the 2013 commercial sockeye harvest, while set netters caught about 38%.

## B. Proceedings

### 1. CIFF's suit and preliminary injunction motion

On July 17 CIFF sued the Department and sought a preliminary injunction compelling the Commissioner to "open the required 51 hours of extra fishing periods for the Upper Cook Inlet set gillnet fishery." It based its request on the Kenai River Late-Run Sockeye Salmon Management Plan, which provides in part that "the [C]ommissioner *may*, by emergency order, allow extra fishing periods of no more than 51 hours per week" when the Kenai River sockeye run is strong.[9] CIFF argued that given the abundance of Kasilof River sockeye, set netters "should [have been] fishing up to 51 extra hours each week according to the management plan."[10] It contended that "[t]he Commissioner continues to limit the set gillnet permit holders['] fishing periods citing concerns for the Kenai River kings[, a]ll the while, allowing other user groups to catch kings." It argued that the emergency orders were an illegal reallocation of resources — "a complete bypass of the Board's lawfully adopted management plan."

_____

[9]     5 AAC 21.360(c)(2)(B) (emphasis added).

[10]     *See* 5 AAC 21.365(c)(3) (providing that on July 8 fishing near the Kasilof River is subject to the 51-hour discretionary rule as outlined in 5AAC 21.360(c)).

In response the Department contended that "CIFF's legal arguments boil down to an insistence that the word 'may' in the . . . Management Plan . . . be interpreted as 'must.' " The Department also argued that CIFF had not met the high standard required for mandatory preliminary injunctions.[11] The Commissioner had done nothing wrong, the Department argued, because AS 16.05.020(2) requires the Commissioner to "manage, protect, maintain, improve, and extend the fish . . . resources of the state in the interest of the economy and general well-being of the state" and because under AS 16.05.060 the Commissioner may "summarily open or close seasons or areas or . . . change weekly closed periods on fish or game by means of emergency orders" that have "the force and effect of law." Because set netters incidentally harvest ten times more king salmon than drift netters, the Department contended that limiting the set net fishery in times of weak Kenai River king runs was logical. The Department requested that the court not second-guess the Department's careful in-season management decisions.

CIFF replied: "The Department has recharacterized [our] request as one for a mandated opening of a maximum number of allotted additional hours. This is inaccurate. [We] request[] the Court require the Commissioner [to] comply with the management plans." It argued the Commissioner was overstepping her emergency order authority by allowing an over-escapement of sockeye into the Kasilof River because "[o]verescapement is at least as detrimental to the salmon stock as under-escapement"

---

[11] *See State v. Kluti Kaah Native Vill. of Copper Ctr.*, 831 P.2d 1270, 1274 n.9 (Alaska 1992) ("[A] mandatory injunction . . . should be granted only in extreme or exceptional cases [and] . . . with great caution." (last two alterations in original) (quoting 42 AM. JUR. 2D. *Injunctions* § 21 (1969))). Unlike a prohibitory injunction, which "forbids or restrains an act," a mandatory injunction "orders an affirmative act or mandates a specified course of conduct." BLACK'S LAW DICTIONARY 904-05 (10th ed. 2014).

and because the Commissioner should not "favor[] one escapement goal over the sustainability of another species."

### 2.    The preliminary injunction hearing and ruling

The superior court held a preliminary injunction hearing on July 30. CIFF clarified that it was seeking an injunction in part to require the Commissioner to exercise her "discretion and expand the number of hours available to [the set net] fishery," and in part to "compel[] the Department to adhere to its own regulations."

An area management biologist for the Department's commercial fisheries division testified. When asked why the drift net fishery remained open if the Department was attempting to protect the late-run Kenai River kings, the biologist responded that the Department made the "discretionary management" decision not to close that fishery because "the drifters harvest far fewer, about one[-]tenth of the king salmon that the . . . setnet fishery harvests, [and] we're using [the drift netters] as a tool to control sockeye escapements while minimizing the harvest of king salmon."

Recalling a Board meeting after the challenging 2012 fishing year, the biologist testified that although the Board considered many proposed changes to its management plans, it decided not to change the plans and instead "told the Department: Go out and do your job. Take the management plans that we have crafted and we'll trust your discretionary use of . . . emergency order authority and following the plans as they're written . . . ." When asked whether the Department prioritized exceeding minimum escapement goals over not exceeding maximum ones, the biologist replied that the Department placed a "higher priority" on exceeding a minimum escapement goal, but that it also tried not to exceed maximum escapement goals by too much.

CIFF presented the telephonic testimony of a retired area management biologist. The retired biologist expressed his opinion that in 2012 the Department had "basically put the priority on king salmon management and . . . let the dice roll or

whatever on sockeye management." He believed that in 2013 the Department also "put the priority on king salmon conservation" while risking over-escaping sockeye populations. According to the retired biologist, both over-escapement and under-escapement are detrimental to the sustained yield of a stock, but over-escapement could reduce future yield anywhere from 10% to 20%. On cross-examination, however, the retired biologist admitted that he had "over-escaped" the Kasilof River sockeye run "numerous times" when it was under his management.

The Department's director of commercial fisheries also testified; like the Department's current biologist, he stated that he came away from the 2012 Board meeting with a sense that the Board made no changes to its management plans because it trusted the Department to use its discretionary authority appropriately. The director also explained that the Department's discretionary authority existed to deal with the fact that "Mother Nature throws curves at us every year, . . . be it run timing, run strength, size of fish, [or] vulnerability to gear." He testified that the Department prioritized meeting the lower range of an escapement goal over exceeding the upper range because not meeting an escapement goal was riskier than exceeding one. "[Y]ou have to be real cautious about counting on something happening at the end of the season," the director said, "because if you're wrong, there is no room to catch back up. There's no . . . fish run left. And so that's why you see us being conservative at this point."

A Department scientist also testified. Like the Department's other two witnesses he explained that it was riskier to fall short of an escapement range than to exceed one because the projected sustained yield declines more drastically when the lower goal is not met. He testified that the upper escapement goal could better tolerate an excess of salmon "before the effects of too many spawners on the spawning ground becomes an issue with reducing yield."

The day after the hearing the superior court issued an order denying CIFF's request for a preliminary injunction. The court found that because CIFF's claim involved only economic harm, the harm was not irreparable. The court then reasoned that the Department's interests would not be adequately protected if the set net fishery were reopened because "serious harm to the health" of the late-run Kenai River kings could result, and this harm would thwart the Department's "constitutional duty to manage" fish stocks consistent with sustained yield.

The superior court therefore declined to apply the balance-of-hardships test and instead analyzed whether CIFF had demonstrated "a clear showing of probable success on the merits." The court concluded that CIFF had not, because the additional 51 discretionary fishing hours per week that CIFF wanted the Commissioner to provide were just that — discretionary. The court also concluded that the Commissioner's in-season management decisions did not reallocate salmon stocks in contravention of the various management plans, all of which granted the Commissioner considerable discretion. Crediting the Department employees' testimony, the court found that "the risk of an underescapement is much more likely to have a detrimental long-term impact on the Kenai River king salmon than the negative impact caused by an overescapement of Kasilof River sockeye salmon." The court refused to second-guess the Commissioner's discretionary use of her emergency authority, concluding that an injunction requiring the Department to comply with the applicable regulations "would serve no effective purpose" and that an injunction mandating additional set net fishing times "would be unworkable and unreasonable in the present circumstances."

### 3. CIFF's other causes of action

The day before the preliminary injunction hearing CIFF had amended its complaint to include: (1) a claim for declaratory relief requesting that the court uphold the validity of the Board's salmon management plans and direct the Department to

follow them; (2) a claim under the Alaska Constitution's various natural resources clauses alleging that the Department "violated [CIFF's] constitutional rights by improperly excluding its members from fishing regularly scheduled periods and extra periods, while at the same time allowing all other user groups to fish their regular period[s] and additional extra periods"; and (3) a claim for "negligent management and/or willful mismanagement of fisheries."  CIFF sought damages for its set netter members in connection with its constitutional and tort claims.

The Department moved for summary judgment on all of CIFF's claims.  In opposing summary judgment CIFF argued that "summary judgment cannot be granted to the [D]epartment because CIFF has moved for discovery under [Alaska Civil Rule] 56(f)."[12]  In a four-paragraph order the superior court granted summary judgment to the Department.  It reasoned that no material facts were in dispute and that CIFF "failed to articulate any concrete way in which the Department overstepped its management authority other than the claim — already rejected [in connection with the] preliminary injunction [motion] — that [CIFF's set netters] were entitled to 51 hours of extra fishing-time by law."  The superior court awarded the Department 30% of its attorney's fees,

---

[12]     Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing [summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

about $19,400, justifying the award on the grounds that the preliminary injunction hearing was essentially a trial and that the issues presented were "fairly complex."[13]

CIFF appeals, arguing that the superior court abused its discretion by denying CIFF's Rule 56(f) motion, and that whether the Department strayed from its management plans presented genuine issues of material fact, making summary judgment improper as to: (1) its negligent or willful fisheries mismanagement claim; (2) its constitutional claims; and (3) its claim for injunctive relief. CIFF also appeals the attorney's fees award.

## III. STANDARD OF REVIEW

"An Alaska Civil Rule 56(f) decision is reviewed for abuse of discretion."[14] Grants of summary judgment are reviewed de novo.[15] Attorney's fees awards are

---

[13]    *See* Alaska R. Civ. P. 82(b)(2) (establishing 30% attorney's fees award for cases without a money judgment that go to trial and 20% attorney's fees award for cases without a money judgment "resolved without trial"); Alaska R. Civ. P. 82(b)(3)(A) (permitting superior court to vary attorney's fees award due to "the complexity of the litigation").

[14]    *RBG Bush Planes, LLC v. Kirk*, 340 P.3d 1056, 1060 (Alaska 2015).

[15]    *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014). "[A] party seeking summary judgment has the initial burden of proving, through admissible evidence, that there are no [genuine] disputed issues of material fact and that the moving party is entitled to judgment as a matter of law." *Id.* at 517 (alterations in original) (quoting *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 760 n.25 (Alaska 2008)); *see also* Alaska R. Civ. P. 56(c). After the moving party satisfies that burden, "the burden shifts to the non-moving party 'to set forth specific facts showing that he could produce evidence reasonably tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact exists.' " *Christensen*, 335 P.3d at 517 (quoting *State, Dep't of Highways v. Green*, 586 P.2d 595, 606 n.32 (Alaska 1978)). "[A] non-moving party cannot create a genuine issue of material fact merely by offering admissible evidence — the offered evidence must not be too conclusory, too

(continued...)

reviewed for abuse of discretion, and we "will not find an abuse of discretion absent a showing that the award was arbitrary, capricious, manifestly unreasonable, or stemmed from an improper motive."[16]

## IV.    DISCUSSION

### A.    The Superior Court Did Not Abuse Its Discretion By Implicitly Denying CIFF's Civil Rule 56(f) Request.

In opposing summary judgment CIFF requested a Rule 56(f) continuance "to depose critical department employees responsible for making decisions related to Cook Inlet fisheries." During an earlier hearing CIFF had elaborated on its request: "This is a major part of our position, that CIFF must be able to conduct discovery to determine the basis for the Department's gross deviation from [the] requirements of . . . management plans and to determine how those deviations were arrived at and who influenced the Department to deviate from them." Notwithstanding that (1) CIFF's members included both set net and drift net commercial fishers, as well as non-commercial fishers, and (2) CIFF provided no evidence suggesting the Commissioner was motivated by anything other than managing the strong sockeye run and the weak king run, CIFF stated that its set net fishers lacked the "political pull or the inside wink and a nod to managers" of other interest groups and argued for more time to determine

---

[15]      (...continued)
speculative, or too incredible to be believed, and it must directly contradict the moving party's evidence." *Id.* at 516. "After the court makes reasonable inferences from the evidence in favor of the non-moving party, summary judgment is appropriate only when no reasonable person could discern a genuine factual dispute on a material issue." *Id.* at 520 (footnote omitted). Whether a genuine factual dispute exists is a question of law reviewed de novo. *Id.* at 519 & n. 40.

[16]      *Bush v. Elkins*, 342 P.3d 1245, 1251 (Alaska 2015) (quoting *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 137 (Alaska 2014)).

who had been pressuring the Department to ignore the management plans. The superior court granted summary judgment to the Department without ruling on CIFF's Rule 56(f) request. CIFF now repeats its arguments to us, but these arguments are unavailing.

The management decisions themselves — the emergency orders, which included the reasons for them — were compiled and presented to the superior court and are the undisputed material facts key to resolving whether, in light of the 2013 king and sockeye runs, the Commissioner's discretionary actions were authorized by the Board's management plans. Accordingly whatever CIFF would have discovered from deposing "past and current . . . department employees" would not have been "essential to justify" CIFF's summary judgment opposition.[17] The superior court's failure to expressly address CIFF's Rule 56(f) request, and its implicit denial of that request, had no effect on the ultimate grant of summary judgment based on the legal conclusion that the Commissioner's discretionary actions were authorized by the various management plans.[18] In short, because the Commissioner's discretionary actions were lawful, there was no need for discovery about who allegedly pressured her to undertake allegedly unlawful actions.

---

[17]    Alaska R. Civ. P. 56(f).

[18]    *See Sengupta v. Univ. of Alaska*, 21 P.3d 1240, 1260 (Alaska 2001) (affirming denial of a second Rule 56(f) request in part because this court's examination of an affidavit filed after the expiration of the first Rule 56(f) continuance revealed that the affidavit did "not raise a genuine issue of fact with respect to" the nonmovant's claim); *Coulson v. Marsh & McLennan, Inc.*, 973 P.2d 1142, 1146-47 (Alaska 1999) (holding superior court did not err when it granted movant summary judgment without granting nonmovant a Rule 56(f) continuance because this court's examination of document sought to be discovered revealed that it was "immaterial" and "irrelevant"); *Mount Juneau Enters. v. City & Borough of Juneau*, 923 P.2d 768, 777 (Alaska 1996) (affirming denial of Rule 56(f) continuance in part because "the superior court did not believe that a genuine issue of material fact would emerge from further discovery").

We note that CIFF did not sue the Commissioner in her personal capacity. Had CIFF sued the Commissioner for damages in her personal capacity and shown under our three-factor test that the Commissioner's official immunity was qualified as opposed to absolute,[19] then whether the Commissioner had exercised her allowable discretion in bad faith, with malice, or with corrupt motives might be relevant to her qualified official immunity.[20] But CIFF sued only the Department, asserting only that the Commissioner's discretionary actions had violated the Board's fisheries management plans — we emphasize that each and every claim and request for relief set forth in CIFF's amended complaint was predicated on the allegation the Commissioner's actions violated the Board's management plans.

B.      **The Superior Court Did Not Err By Granting Summary Judgment On CIFF's Claim Of Fishery Mismanagement In Violation Of Board Management Plans.**

CIFF argues that the retired biologist's testimony during the preliminary hearing created genuine issues of material fact as to the Department's mismanagement of the Upper Cook Inlet fishery in violation of the Board's management plans. CIFF emphasizes the retired biologist's testimony that the Department "basically put the priority on king salmon management, and . . . let the dice roll or whatever on sockeye

---

[19]      *See Weed v. Bachner Co.*, 230 P.3d 697, 699-700 (Alaska 2010).

[20]      *See Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 158 (Alaska 1987); *see also Weed*, 230 P.3d at 703 (stating that qualified official immunity is overcome when the official's conduct is "outrageous or evidence[s] reckless indifference"); *cf. Bachner Co. v. Weed*, 315 P.3d 1184, 1190-94 (Alaska 2013) (affirming summary judgment ruling that state bid procurement evaluation committee members did not act with bad faith sufficient to defeat qualified immunity when they followed published bid guidelines, used "a fair process" in evaluating the bids, and there was no "objective evidence . . . support[ing] an inference of malice" or one committee member's "attempt to pursue his personal interests" in bad faith).

management." CIFF also highlights the retired biologist's testimony that the Department should have followed "a cookbook plan" for late-run Kenai River king management and that the Kasilof River sockeye fishery should have been opened earlier because the relevant management plan[21] gives the Department, in the retired biologist's words, "the instruction [that] if you get 50,000 fish in here between . . . June 20th and June 25th, trigger an early opening *if you think it's necessary*."[22] (Emphasis added.) According to CIFF the retired biologist's testimony that over-escapement poses "a significant biological issue" also raised a genuine issue of material fact.[23] The Department responds that CIFF's retired biologist's testimony is "no more than a policy disagreement with [the Department] that is unfounded in the management plans."

### 1. CIFF's reliance on *Peninsula Marketing Ass'n v. Rosier*[24] is misplaced.

The gist of CIFF's argument is that the Commissioner's discretionary in-season management decisions resulted in a "massive reallocation" of salmon resources

---

[21]    *See* 5 AAC 21.365(c)(1) (citing 5 AAC 21.310(b)).

[22]    *See* 5 AAC 21.310(b)(2)(C)(i) ("[I]f the department estimates that 50,000 sockeye salmon are in the Kasilof River before June 25, but on or after June 20, the commissioner *may* immediately, by emergency order, open the fishery . . . ." (emphasis added)).

[23]    CIFF also argues that "[i]f the king salmon [escapement] goal was so important," then "the sport fishery should have been limited or closed" before the set net fishery was closed. But the Kenai River Late-Run King Salmon Management Plan plainly states that "[t]he department shall manage the late-run Kenai River king salmon stocks primarily for sport and guided sport uses" and not for commercial uses. 5 AAC 21.359(a). And the argument is factually incorrect because beginning in June 2013 the Department continually limited Kenai River king sport fishing by emergency order. By contrast set netters were permitted to harvest kings until July 28.

[24]    890 P.2d 567 (Alaska 1995).

-17-                                                                7056

contrary to the Board's intent, and CIFF cites *Peninsula Marketing Ass'n v. Rosier* for the proposition that "an emergency order may not be used by the [D]epartment to 'override' decisions by the [B]oard."[25] In *Rosier* the Commissioner had recommended that the Board reduce the number of subsistence chum salmon that a sockeye fishery could incidentally harvest before closing to preserve subsistence chum uses, and although the Board extensively considered the proposal and heard public testimony during its regular meeting, it chose not to adopt the Commissioner's proposal.[26] The Governor later "directed the Commissioner to use his emergency powers to increase the chum escapement into various river systems, notwithstanding the Board's failure to adopt the Commissioner's proposal," the Commissioner did so, and commercial sockeye fishers sought to enjoin the Commissioner's action in superior court.[27] The superior court issued an injunction.[28] On appeal we affirmed, holding "that the Commissioner may not use his emergency powers to implement a fisheries management program already considered and rejected by the Board, in the absence of newly developed information or events occurring after the Board's decision."[29]

Unlike in *Rosier*, where the Commissioner clearly contravened the Board's decision, nothing in this case indicates that the Commissioner's discretionary in-season management decisions conflicted with the Board's management plans. CIFF's statement to the contrary — that "this is a situation where the [B]oard had already decided to leave

---

[25]    *Id.* at 573.

[26]    *Id.* at 568-69.

[27]    *Id.* at 569.

[28]    *Id.*

[29]    *Id.* at 574.

the framework plans in place, such that the [D]epartment's 2013 in-season actions did indeed override a specific [B]oard decision" — has no factual foundation because CIFF fails to cite any specific management plan provision the Commissioner allegedly violated. CIFF's reliance on *Rosier* is thus misplaced.

**2. The Commissioner's discretionary in-season management decisions were authorized by the Board's management plans.**

The Commissioner's discretionary in-season management decisions — curbing and then closing the set net but not the drift net fishery when faced with a strong sockeye run, a weak king run, and data indicating set netters incidentally harvest more kings — all were within the range of discretion permitted by the Board.

Although the Kenai River Late-Run Sockeye Salmon Management Plan requires the Commissioner to manage "primarily for commercial uses based on abundance," she must also "manage the commercial fisheries to minimize the harvest of . . . late-run Kenai River king . . . to provide personal use, sport, and guided sport fishermen with a reasonable opportunity to harvest salmon resources."[30] The Kenai River Late-Run King Salmon Management Plan requires the Commissioner to manage the late-run Kenai River kings "for sport and guided sport uses,"[31] and when "the projected late-run king salmon escapement" drops below 15,000 kings, the Commissioner must "close the commercial set gillnet fishery in the Upper Subdistrict,"[32] exactly what was done in 2013.

The Kasilof River Salmon Management Plan states that in harvesting "salmon excess to spawning escapement needs," the fishery must be opened "consistent

---

[30]     5 AAC 21.360(a).

[31]     5 AAC 21.359(d)(3).

[32]     5 AAC 21.359(b)(3)(C).

with escapement objectives for upper Cook Inlet salmon," which logically includes the escapement objectives for late-run Kenai River kings.[33]  The broader Upper Cook Inlet Salmon Management Plan states that "the burden of conservation shall, to the extent practicable, be shared among all user groups in close proportion to their respective harvest on the stock of concern."[34]  Although Department employees testified the late-run Kenai River kings were not yet an official "stock of concern,"[35] data indicated that the Kenai River king stock had begun to severely weaken in recent years.  Because the set net fishery incidentally harvests roughly 14 times more kings than the drift net fishery, it was logical and permissible under the Upper Cook Inlet Salmon Management Plan for the Commissioner to restrict set net fishing while using the drift net fishery to control the upper escapement limits for sockeye populations returning to the Kasilof and Kenai Rivers.

CIFF argues, without any specificity, that the Commissioner violated management plans.  But every relevant management plan contains a provision recognizing that the Commissioner's emergency authority is instrumental to effective fisheries management:

> Notwithstanding any other provision of this chapter, it is the intent of the board that, while in most circumstances the [D]epartment will adhere to the management plans in this chapter, no provision within a specific management plan is intended to limit the commissioner's use of emergency order authority under AS 16.05.060 to achieve established

---

[33]     5 AAC 21.365(a).

[34]     5 AAC 21.363(a)(6).

[35]     *See* 5 AAC 39.222(f)(35) (defining "stock of concern" as "a stock of salmon for which there is a yield, management, or conservation concern").

escapement goals for the management *plans* as the primary management objective.[36]

The statewide salmon management plan counsels that "in the face of uncertainty, salmon stocks . . . shall be managed conservatively" using a "precautionary approach" to avoid "potentially irreversible changes,"[37] and it explicitly states "that where the impact of resource use is uncertain, but likely presents a measurable risk to sustained yield, priority should be given to conserving the productive capacity of the resource."[38] The Commissioner's actions were undisputedly directed toward preserving the late-run Kenai king stock, which through her efforts barely achieved the minimum escapement goal. This statewide policy supplies further authority for the Commissioner's actions.[39]

---

[36]    5 AAC 21.363(e) (emphasis added); *see also* 5 AAC 21.353(h) ("The commissioner may depart from the provisions of the [Central District Drift Gillnet Fishery Management Plan] under this section as provided in 5 AAC 21.363(e)."); 5 AAC 21.359(j) (authorizing same departure from the Kenai River Late-Run King Salmon Management Plan); 5 AAC 21.360(j) (authorizing same departure from the Kenai River Late-Run Sockeye Salmon Management Plan); 5 AAC 21.365(g) (authorizing same departure from Kasilof River Salmon Management Plan).

[37]    *See* 5 AAC 39.222(c)(5).

[38]    5 AAC 39.222(c)(5)(A)(iv); *see also* 5 AAC 39.222(b) (stating that one broad goal of the Board's statewide salmon management plan "is to ensure conservation of salmon").

[39]    *See also* 5 AAC 39.222(c)(2)(F) (establishing statewide salmon management policy and stating "salmon escapement and harvest management decisions should be made in a manner that protects nontarget salmon stocks or species"); 5 AAC 39.222(c)(4)(D) ("[A]n understanding of the proportion of mortality inflicted on each salmon stock by each user group, should be promoted, and the burden of conservation should be allocated across user groups . . . . [T]he burden of conservation shall be shared among all fisheries in close proportion to each fisheries' respective use . . . ."); 5 AAC (continued...)

Recognizing the complexity of Alaska's fisheries, we repeatedly have refrained from substituting our judgment for that of the trained biologists and other scientists hired to manage Alaska's fisheries.[40] We similarly have refrained from second-guessing the Commissioner's use of her statutory discretionary authority: "The Commissioner may . . . use the emergency order process to close down one type of fishery and not another in order to implement a policy establishing priorities of use."[41] And we previously held that a fishery management policy was not arbitrary and unreasonable, but rather was "consistent with and reasonably necessary to the

---

[39]    (...continued)
39.220(a) ("In applying this statewide mixed stock salmon policy for all users, conservation of wild salmon stocks consistent with sustained yield shall be accorded the highest priority.").

[40]    *See, e.g.*, *Native Vill. of Elim v. State*, 990 P.2d 1, 8 (Alaska 1999) ("The Board must balance economic, ecological, cultural, international, and other policy concerns when it makes decisions about Alaska's fisheries. It must accommodate all of these legitimate interests in the face of substantial scientific uncertainty. Moreover, it is the Board's role to reach this accommodation. Courts are singularly ill-equipped to make natural resource management decisions. Consequently, we do not substitute our judgment for that of the Board." (citing *Stepovak-Shumagin Set Net Ass'n v. State, Bd. of Fisheries*, 886 P.2d 632, 637 (Alaska 1994); *Meier v. State, Bd. of Fisheries*, 739 P.2d 172, 174 (Alaska 1987))); *see also Metlakatla Indian Cmty., Annette Island Reserve v. Egan*, 362 P.2d 901, 915 (Alaska 1961), *vacated on other grounds*, 369 U.S. 45 (1962) ("Control of fishing, by enforcement officers advised by biologists experienced in the escapement requirements of each spawning area, is an absolute necessity if preservation and re-building of the depleted runs is to be accomplished.").

[41]    *Kenai Peninsula Fisherman's Coop. Ass'n v. State*, 628 P.2d 897, 907 (Alaska 1981).

conservation and development of Alaska fishery resources," when it limits harvest quotas and fishing times in two fisheries to protect escapement levels in an adjoining fishery.[42]

Based on the parties' evidence and arguments, no one disputes the state of Upper Cook Inlet's 2013 king and sockeye runs or the discretionary actions the Commissioner took during the commercial fishing season. During the preliminary injunction litigation CIFF compiled and presented a lengthy exhibit including all of the Commissioner's emergency orders forming the basis of CIFF's fisheries mismanagement claim. The testimony of a retired biologist that the Commissioner prioritized king management while letting "the dice roll or whatever on sockeye management" does not create a genuine issue of material fact whether the Commissioner's emergency orders were outside her authority and violated the Board's management plans. The superior court properly granted summary judgment to the Department on CIFF's fishery mismanagement claim.[43]

---

[42] *Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries*, 803 P.2d 391, 399 (Alaska 1990) (quoting *Meier*, 739 P.2d at 175); *see also Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 693-94 (Alaska 2001) (stating that "[t]his court is not empowered to resolve" policy disputes over the management of Alaska's natural resources so long as the agency did not act unreasonably or arbitrarily).

[43] As noted earlier, at the preliminary injunction hearing CIFF stated that in part it was seeking to have the court direct the Commissioner *how* to exercise her discretion in managing the sockeye set net fishery. We reiterate that each and every claim in CIFF's amended complaint was predicated on the allegation that the Commissioner's actions were not authorized by the Board's management plans. As a matter of law, the Commissioner's decisions were authorized by the Board's management plans.

To the extent the fishery mismanagement claim alleged in CIFF's amended complaint is a putative tort claim directed to how the Commissioner exercised her lawful discretion, as opposed to the Commissioner's discretionary actions being lawful, we note two considerations. First, CIFF's claim would be barred by sovereign immunity. *See*

(continued...)

**C. The Superior Court Did Not Err By Granting Summary Judgment On CIFF's Article VIII Uniform Application Claim.**[44]

CIFF accuses the Department of violating article VIII's uniform application clause, which provides: "Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation."[45] Classifications made under this clause must have a "legitimate purpose" important enough to justify

---

[43] (...continued)
AS 09.50.250(1) (barring tort actions "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion is abused"). Second, in *Mesiar v. Heckman* we declined to recognize a cause of action for "negligent resource-management," holding that the Department does not owe a fisheries resource user an actionable duty of care because fisheries management decisions inevitably benefit some user groups while harming others, and if subjected to these types of lawsuits, the Department might abandon "sound principles of resource management" in favor of placating competing user groups. 964 P.2d 445, 448-52 (Alaska 1998). CIFF articulates no sound basis why a claim for "willful fisheries mismanagement" would not be barred by *Mesiar*.

[44] "[W]e exercise our independent judgment in reviewing whether an agency action is consistent with the Alaska Constitution." *Manning v. State, Dep't of Fish & Game*, __ P.3d __, Op. No. 7036, at 8, 2015 WL 5061353, at *3 (Alaska August 28, 2015). Although CIFF's constitutional claim was predicated on the infirm allegation that the Commissioner's actions were outside her authority under the Board's management plans, we will address CIFF's article VIII uniform application claim as it relates to the Commissioner's lawful actions. And although CIFF also cites the general equal protection provision of article I, § 1, it fails to provide any legal analysis under that constitutional provision; the general equal protection argument is therefore waived for inadequate briefing. *Kingery v. Barrett*, 249 P.3d 275, 285 (Alaska 2011) (stating party waives legal arguments by "inadequately briefing them"); *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

[45] Alaska Const. art. VIII, § 17.

"infringement on article VIII's open access values."[46] The Commissioner's emergency order restricting the set net fishery stated as its purpose achieving the sustainable escapement goal for the late-run Kenai River kings.

As a threshold matter CIFF argues that our previous cases on Article VIII natural resources rights are all distinguishable because each dealt with Board regulations and not "in-season management measures taken by the [D]epartment." But this distinction matters little. The Alaska Constitution empowers the legislature to utilize, develop, and conserve Alaska's fisheries;[47] the legislature delegated this power to the Board of Fisheries;[48] and the Board in turn chose to rely on the Commissioner's statutory emergency order authority to attain regulatory escapement goals for the various Upper Cook Inlet fish stocks.[49] Accordingly our precedents analyzing Article VIII claims apply equally to both the Board's regulations and the Commissioner's in-season emergency orders implementing them, which have "the force and effect of law."[50]

---

[46] *Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries*, 803 P.2d 391, 399 (Alaska 1990) (quoting *McDowell v. State*, 785 P.2d 1, 10 (Alaska 1989)).

[47] Alaska Const. art. VIII, § 2.

[48] *See* AS 16.05.221(a) ("For purposes of the conservation and development of the fishery resources of the state, there is created the Board of Fisheries . . . ."); AS 16.05.251(a)(12) ("The Board of Fisheries may adopt regulations it considers advisable . . . for . . . regulating commercial . . . fishing as needed for the conservation, development, and utilization of fisheries . . . .").

[49] 5 AAC 21.363(e) ("[N]o provision within a specific management plan is intended to limit the commissioner's use of emergency order authority . . . to achieve established escapement goals for the managements plans as the primary management objective.").

[50] AS 16.05.060(c); *see also Kenai Peninsula Fisherman's Coop. Ass'n v. State*, 628 P.2d 897, 907 (Alaska 1981) ("The extent of the Commissioner's power under
(continued...)

-25-                                                          7056

CIFF argues that the Commissioner's management decisions threatened the sustained yield of the Upper Cook Inlet sockeye stocks and therefore violated the Alaska Constitution's sustained yield clause.[51] This argument is without merit. As explained to the Alaskans who ratified it:

> The [natural resources] article's primary purpose is to balance maximum use of natural resources with *their continued availability to future generations*. In keeping with that purpose, all replenishable resources are to be administered, *insofar as practicable*, on the sustained yield principle.[52]

Alaska's statewide salmon management policy lists as one of its goals the "conservation of salmon,"[53] and under our Constitution, statutes, and regulations, salmon must be conserved for the benefit of all Alaskans.[54] "Conserving implies controlled utilization of a resource to prevent its exploitation, destruction or neglect. . . . If the

---

[50]     (...continued)
AS 16.05.060 should . . . be interpreted in light of the overall purpose of the constitutional and legislative scheme of management of state resources prescribed by other provisions of the law. Thus, if the Board properly adopted a plan for the management of state fishery resources, the Commissioner could enforce that policy through the emergency order process.").

[51]     This clause provides: "Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses." Alaska Const. art. VIII, § 4.

[52]     *West v. State, Bd. of Game*, 248 P.3d 689, 696 (Alaska 2010) (alteration in original) (emphasis added) (quoting THE ALASKA CONSTITUTIONAL CONVENTION, PROPOSED CONSTITUTION FOR THE STATE OF ALASKA: A REPORT TO THE PEOPLE OF ALASKA (1956)).

[53]     5 AAC 39.222(b).

[54]     *See* Alaska Const. art. VIII, § 2; AS 16.05.251(a)(12); 5 AAC 39.222.

Board [and the Commissioner are] to accomplish [their] designated purposes, [they are] necessarily going to make decisions concerning utilization of the resources [they are] charged with managing."[55]

We have held that a regulation that opens two "mixed stock interceptor fisheries" only after a third fishery has harvested enough of a certain salmon stock "to ensure proper escapement levels to guarantee sustained yield," and which further allocates the majority of the harvest to the third fishery, does not violate the uniform application clause.[56] Although one's right to equally access Alaska's fish resources "is a 'highly important interest running to each person within the state,' "[57] we concluded that the importance of the Board's interest in adopting the regulation — "ensur[ing] proper escapement levels" — justified regulating the three fisheries differently.[58] Similarly the emergency orders limiting and then closing the set net fishery were justified in light of the historically low Kenai River king run and the fact that the set netters incidentally harvest substantially more kings than drift netters. Accordingly the Department's management decisions did not deny CIFF equal protection under article VIII's uniform application clause.

## D. The Superior Court Did Not Err When It Denied CIFF's Injunctive Relief Claim.

CIFF argues that the superior court abused its discretion by denying CIFF's request for injunctive relief directing the Department to follow the Board's management

---

[55] *Kenai Peninsula*, 628 P.2d at 903 (footnote omitted) (internal quotation marks omitted).

[56] *Id.* at 392-93, 398-400.

[57] *Id.* at 399 (quoting *McDowell v. State*, 785 P.2d 1, 10 (Alaska 1989).

[58] *Id.*

plans. Such an injunction, it argues, complies with Alaska Civil Rule 65(d)'s specificity requirement.[59] The Department argues that an injunction merely requiring it to follow the law would be too vague to enforce effectively and would necessarily "embroil the courts in day-to-day fishery management" decisions. The Department contends it "is not the province of the courts" to assume management of the Upper Cook Inlet salmon fisheries.

When it granted summary judgment to the Department, the superior court did not expressly rule on CIFF's request for injunctive relief, but it did note that CIFF "failed to articulate any concrete way in which the Department overstepped its management authority other than the claim — already rejected on motion for preliminary injunction — that [CIFF's] fishermen were entitled to 51 hours of extra fishing-time by law." We reiterate that CIFF fails to cite any specific management plan provision the Department violated. And we agree with the Department that an injunction simply requiring it "to obey the law" lacks the specificity required to convey what management actions it could take without risking contempt.[60] Finally, issuing such an injunction would potentially put Alaska's court system in the untenable position of managing one

---

[59]    Alaska R. Civ. P. 65(d) provides in part:  "Every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . ."

[60]    *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[T]he specificity provisions of [the analogous federal rule] are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.").

of Alaska's most crowded and contentious fisheries,[61] despite our long-standing policy of not second-guessing the Department's management decisions based on its specialized knowledge and expertise.[62] For these reasons, the superior court did not err when it rejected CIFF's declaratory and injunctive relief claims in connection with the grant of summary judgment.

### E. The Superior Court Did Not Abuse Its Discretion When It Awarded Enhanced Attorney's Fees.

The superior court awarded the Department 30% of its reasonably incurred attorney's fees, about $19,400, reasoning that through the preliminary injunction hearing "the case was, in essence, tried on the merits."[63] The court also justified its award on the ground that CIFF "presented fairly complex issues requiring expert testimony on statistical sampling and analysis of the impact of set-netting on fish populations."[64]

---

[61] *See Kenai Peninsula*, 628 P.2d at 899 (noting "[a]ll five species of salmon enter Cook Inlet, with considerable overlap in timing and migration routes" and both commercial and recreational users harvest these salmon).

[62] *See Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 691 (Alaska 2001) (stating when Board of Game acts consistently with its overarching statutory purposes, we will not inquire "whether a regulation is *necessary* as a means to a legislative end" because such inquiry "would mire this court in questions of public policy and the advisability of possible alternatives" and is in any event "beyond our authority and expertise" (emphasis in original) (quoting *State, Dep't of Revenue, Permanent Fund Div. v. Cosio*, 858 P.2d 621, 624 n.1 (Alaska 1993))); *Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries*, 803 P.2d 391, 397 (Alaska 1990) ("We have no authority to substitute our own judgment for the Board of Fisheries' particularly since highly specialized agency expertise is involved." (quoting *Meier v. State, Bd. of Fisheries*, 739 P.2d 172, 174 (Alaska 1987))).

[63] *See* Alaska R. Civ. P. 82(b)(2) (setting base standard of 30% for matters that go to trial and 20% for matters resolved without trial).

[64] *See* Alaska R. Civ. P. 82(b)(3) (allowing variation from base standard for

(continued...)

CIFF argues that the superior court abused its discretion by awarding the Department 30% of its attorney's fees, rather than 20%, because the preliminary injunction hearing was not similar to a trial and because it "did not resolve or even address all (or most) of the issues presented." The Department defends the award, arguing that it "was consistent with the civil rules, supported by the record, and within [the superior court's] discretion."

We affirm the enhanced fee award based on the complexity of the litigation alone[65] and express no opinion on whether preliminary injunction hearings can be treated like trials for attorney's fees purposes. Accordingly the superior court did not abuse its discretion when it awarded the Department 30% of its reasonably incurred attorney's fees.

## V.     CONCLUSION

We AFFIRM the superior court's judgment.

---

[64]     (...continued) various reasons, including "complexity of the litigation").

[65]     *See BP Pipelines (Alaska) Inc. v. State, Dep't of Revenue*, 327 P.3d 185, 197 (Alaska 2014) ("While we have occasionally expressed concern about the use of factor (A) — complexity of the litigation — to enhance fees . . . we have repeatedly upheld its use." (alteration in original) (quoting *Ware v. Ware*, 161 P.3d 1188, 1199 (Alaska 2007))); *Hiller v. Kawasaki Motors Corp., U.S.A.*, 671 P.2d 369, 375 (Alaska 1983) (affirming award of about 23% of actual fees because "[t]he litigation was complex and lengthy").