*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| COOK INLET FISHERMAN'S FUND, | ) ) | Supreme Court No. S-17955 |
| | ) | |
| Appellant, | ) | Superior Court No. 3KN-19-00641 CI |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| STATE OF ALASKA, DEPARTMENT OF FISH AND GAME and ALASKA BOARD OF FISHERIES, | ) ) ) ) | No. 7611 – August 12, 2022 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Jason M. Gist, Judge.

Appearances: Carl Bauman, Law Offices of Carl Bauman, Kenai, for Appellant. Aaron C. Peterson, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellees.

Before: Winfree, Chief Justice, Maassen, Carney, and Henderson, Justices. [Borghesan, Justice, not participating.]

MAASSEN, Justice.

## I. INTRODUCTION

A nonprofit entity representing commercial fishers sued the Alaska Board of Fisheries and the Department of Fish and Game, alleging that the State's fishery

management practices in Cook Inlet were unjustified and violated federal law and national standards. The nonprofit sought to depose two current Fish and Game employees but the State opposed, arguing that all material facts necessary for a decision of the case were in the administrative record.

The superior court agreed with the State and quashed the nonprofit's deposition notices. The court also granted summary judgment in favor of the State, deciding that the Cook Inlet fishery was not governed by federal standards and that none of the nonprofit's disagreements with the State's fishery management practices stated a violation of statute or regulation.

The nonprofit appeals. Because the superior court did not abuse its discretion by quashing the deposition notices, and because it correctly concluded that Alaska's fishery management is not governed by national standards, we affirm the judgment of the superior court.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

The Alaska Department of Fish and Game and the Alaska Board of Fisheries (collectively the State) "are charged with the duty to conserve and develop Alaska's salmon fisheries on the sustained yield principle."[1] The Board is more specifically tasked with "allocat[ing] fishery resources among personal use, sport, guided

---

[1]    5 Alaska Administrative Code (AAC) 39.223(a) (2021); *see also* AS 16.05.251(h) (requiring the Board to "adopt by regulation a policy for the management of mixed stock fisheries . . . in a manner that is consistent with sustained yield of wild fish stocks"); Alaska Const. art. VIII, § 4 (requiring that "[f]ish . . . and all other replenishable resources . . . shall be . . . maintained on the sustained yield principle").

sport, and commercial fisheries."[2] Fish and Game pursues its mandate through various management plans.[3] Under the Kenai River Late-Run King Salmon Management Plan in effect at the time relevant here,[4] if the projected in-river return of late-run king salmon was low — so low that the State was unable to "achieve the sustainable escapement goal and provide [a] reasonable harvest opportunity" — the Fish and Game Commissioner had the authority to prohibit by emergency order "the use of bait" in the Kenai River sport fishery for certain periods.[5] When the use of bait in the sport fishery was prohibited, the Commissioner had the authority to also impose specified timing and gear restrictions on the set gillnet fishery.[6]

In April 2019 Fish and Game announced that the outlook for late-run Kenai River king salmon was "well below average." Fish and Game notified the public that it would likely be implementing gear restrictions in July for both sport fishers and set net fishers in accordance with the Kenai River Late-Run King Salmon Management Plan. Fish and Game explained:

> The outlook for the late run of Kenai River king salmon in 2019 is well below average, with a large fish ($\geq$75 cm [mid-eye to tail fork]) forecast of approximately 21,746 fish. The 2019 forecasted total run of large fish approximates the mid-point of the large fish sustainable escapement goal (SEG) of

---

[2]     AS 16.05.251(e).

[3]     *See*, *e.g.*, 5 AAC 21.353-.377 (2021).

[4]     Former 5 AAC 21.359(e) (am. 6/8/2017).

[5]     *Id*. The regulation currently permits the Commissioner to restrict bait "[i]n order to achieve the *optimal* escapement goal." 5 AAC 21.359(e) (2021) (emphasis added).

[6]     Former 5 AAC 21.359(e)(3) (am. 6/8/2017).

13,500 to 27,000 fish. If the run performs as forecast, it is unlikely the SEG would be achieved if commercial[,] sport, and personal use fisheries were prosecuted without any restrictions. Given the tendency to over[-]forecast runs in periods of low productivity, it is likely the in[-]river fishery will begin in July with no bait.

Fish and Game explained how the bait restriction would also impact set netters:

In compliance with the *Kenai River Late-Run King Salmon Management Plan*, for the 2019 fishing season, if the Kenai River king salmon sport fishery is restricted to no bait, the Department intends to implement the set gillnet gear reduction options found in the *Kenai River Late-Run King Salmon Management Plan*. We are providing this intent now to allow fishermen time to modify their fishing strategies and gear.

In July 2019 Fish and Game prohibited the use of bait in the Kenai River king salmon sport fishery "in order to achieve the sustainable escapement goal." Fish and Game also implemented timing and gear restrictions for commercial set net fishers. Toward the end of the season, Fish and Game estimated the 2019 escapement of large late-run Kenai River king salmon at 11,671 fish — below the sustainable escapement goal of 13,500-27,000 fish.[7]

### B.    Proceedings

In July 2019 the Cook Inlet Fisherman's Fund (CIFF), an Alaska nonprofit corporation representing commercial fishers in Cook Inlet, filed a complaint seeking injunctive relief against the State. CIFF asserted that Fish and Game "failed to follow

---

[7]    From 2017 to 2020 the Kenai River king escapement goal was 13,500-27,000 salmon. Former 5 AAC 21.359(b) (am. 6/18/2017). In 2020 the escapement goal was changed to 15,000-30,000 king salmon. 5 AAC 21.359(b) (2021).

the relevant management plans resulting in significant damage to CIFF members, to the commercial fishing industry in general, and to the salmon stocks." It argued that certain Board regulations changing fishery rules were "[w]ithout science-based justification and against the recommendations of experienced [Fish and Game] commercial fishing division personnel." It also claimed that "[t]he practical effect of the emergency orders issued by [Fish and Game] in 2019 is an impermissible allocation of fishery resources among the user groups, and not merely an unavoidable allocative consequence of a permissible use of the emergency order power."

CIFF sought a temporary restraining order, a preliminary injunction, and a permanent injunction directing Fish and Game "to cease and desist imposing arbitrary and unreasonable emergency orders for allocative purposes" and to act in accordance with various Fish and Game regulations.[8] CIFF also argued that "[f]ederal law requires that fisheries be managed in accord with 10 national standards for the conservation and

---

[8] CIFF requested the following relief:

> For temporary, preliminary, and permanent injunctions directing [Fish and Game] (i) to cease and desist imposing arbitrary and unreasonable emergency orders for allocative purposes, (ii) to use the applicable gear specifications such as 5 AAC 21.331, (iii) to use the weekly fishing periods set forth in 5 AAC 21.320(a), (iv) to allow additional authorized openings with reasonable advance notice, (v) to manage the salmon fisheries in Upper Cook Inlet for all escapement goals, as set forth in 5 AAC 21.363(e), not just those for Kings and Coho, (vi) for drift and set net gear to fish the same time periods unless the set gillnets are closed for King salmon under 5 AAC 21.359(d), and (vii) to require that all East Side restrictions under 5 AAC 21.353 be in the Expanded Kenai and Expanded Kasilof Sections to stop [Fish and Game] from restricting to less area.

management of fisheries" as outlined in the Magnuson-Stevens Act[9] and that the State had "strayed impermissibly far from the national standards." CIFF asked the court to require the Board to repeal and rewrite several regulations.[10] The superior court denied CIFF's motion for a temporary restraining order and preliminary injunction on the ground that CIFF had failed to show that it was likely to succeed on the merits of its claims.

CIFF then sought to depose two Fish and Game employees: the commercial fisheries management coordinator for the Cook Inlet area and a fisheries biometrician based in Soldotna. The State moved to quash the deposition notices, arguing that "[d]iscovery is unnecessary, and inappropriate, in this case, as the basis for all [Fish and Game] and Board decisions at issue [is] a matter of public record, and the relevant portions of that record have been incorporated into the administrative record produced to the parties by the State." The State argued that the court's review was limited to the administrative record under our 2015 holding in *Cook Inlet Fisherman's*

---

[9]     16 U.S.C. §§ 1801-1891d.

[10]     CIFF's requests for court-ordered regulatory change included the following: "to suspend and later repeal, . . . 5 AAC 21.310(b)(2)(C)(i), (ii), & (iii) and 5 AAC 21.353(e)"; to "replace 310(b)(2)(C) with: 'the upper set gillnet fishery will close by emergency order when the escapement goal for Kenai and Kasilof sockeye is assured and Coho become the predominant species in the harvest' "; to "replace 353(e) with '(e) when the ESSN fishery in the Kenai, Kasilof, and East Forelands closes, drifting is closed within 5 nautical miles of the Kenai Peninsula shoreline' "; "to suspend and later repeal 5 AAC 21.360(c)(1), (c)(2), and (c)(3)"; "to add to line 5 of 5 AAC 21.365(c)(3) just before the first ';' 'for the conservation of Kenai Sockeye only' and delete the remainder of (c)(3)"; and "to suspend and later repeal 5 AAC 21.359(e) entirely."

*Fund v. State, Department of Fish and Game* (*CIFF 2015*).[11] Fish and Game also argued that because CIFF made no claims that implicated Fish and Game scientists' personal beliefs or motives, there was no legitimate reason to depose them.

The State then moved for summary judgment. The State argued that it was "entitled to summary judgment because it followed the applicable management plans and did not violate the law." It argued that "CIFF fail[ed] to provide any support for its conclusions" that the Board promulgated regulations that were "not based on [the] best available conservation and management concepts," asserting that the administrative record "contain[ed] thousands of documents presented to the board members and over one hundred hours of [Board] meetings that focused on the very plans that CIFF baselessly challenges." The State claimed that "there cannot be a dispute as to [a genuine issue of material fact] as everything that the Board does is a matter of public record. Each argument in favor of and each argument against each proposed regulation is documented and each board deliberation is recorded."

In its opposition to summary judgment, CIFF set out a number of issues of material fact it believed still existed, including whether Fish and Game "overlooked, ignored, or violated the Alaska Statehood Act Section 6(e) requirement that the fish resources in this state be administered, managed, and conserved 'in the broad national interest.'" CIFF also argued that a Ninth Circuit ruling in *United Cook Inlet Drift Association v. National Marine Fisheries Service*[12] (*United Cook Inlet*) required the

---

[11]  357 P.3d 789, 796-97 (Alaska 2015) (in case challenging Fish and Game Commissioner's fisheries management decisions, holding that basis for resolving dispute was "[t]he management decisions themselves — the emergency orders, which included the reasons for them").

[12]  837 F.3d 1055 (9th Cir. 2016).

implementation of national fishery management standards in Cook Inlet.

Before the superior court ruled on the motion to quash and the motion for summary judgment, CIFF moved for leave to file an amended complaint seeking damages and additional injunctive relief. CIFF based its damages claim "on the failure of [Fish and Game] and the Board by negligence, intention, and neglect to manage and conserve the salmon fisheries in Cook Inlet in accord with federal and state law." CIFF also requested money damages to reimburse fishers for their lost fishing opportunities.

The superior court granted the State's motion to quash and motion for summary judgment and denied CIFF's motion for leave to file an amended complaint. The court found that while the Ninth Circuit's decision in *United Cook Inlet* made clear that the national fishery standards must be followed in Cook Inlet, the parameters of a national management plan had not yet been finalized. Thus, the court reasoned, it "could not have required the Board and [Fish and Game] to follow such federal requirements in managing the Cook Inlet fishery in 2019 and 2020, as the [National Marine Fisheries Service] had yet to develop the [federal management plan] for that fishery."

Next the court found that our decision in *CIFF 2015* controlled both the discovery issue and whether to grant summary judgment. The court found CIFF was not entitled to additional discovery beyond the administrative record already in existence and concluded that summary judgment was appropriate.

Finally, the court denied CIFF's motion to amend its complaint. The State moved for attorney's fees, which the superior court granted.

CIFF appeals.

## III.    STANDARD OF REVIEW

"Questions of law are reviewed de novo, 'adopting the rule of law that is

most persuasive in light of precedent, reason, and policy.' "[13] "We review the superior court's rulings on discovery . . . for abuse of discretion."[14] "We will find an abuse of discretion when the decision on review is manifestly unreasonable."[15] "We review grants of summary judgment de novo."[16] We will affirm a grant of summary judgment "if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law."[17]

## IV.  DISCUSSION

### A.  Alaska's Fishery Management Was Not Subject To National Standards During The Period Relevant To This Appeal.

#### 1.  The Alaska Statehood Act does not impose specific ongoing federal requirements on fishery management in state waters.

CIFF's primary argument on appeal is that Alaska's salmon fisheries — including Cook Inlet — "must be managed in the broad national interest," and federal laws therefore apply in state waters.[18] CIFF argues that "under the Alaska Statehood Act

---

[13]     *Smith v. State*, 282 P.3d 300, 303 (Alaska 2012) (quoting *Kohlhaas v. State, Off. of Lieutenant Governor*, 147 P.3d 714, 717 (Alaska 2006)).

[14]     *Punches v. McCarrey Glen Apartments, LLC*, 480 P.3d 612, 619 (Alaska 2021) (citation omitted).

[15]     *Id.* (quoting *Sykes v. Lawless*, 474 P.3d 636, 646 (Alaska 2020)).

[16]     *Creekside Ltd. P'ship v. Alaska Hous. Fin. Corp.*, 482 P.3d 377, 382 (Alaska 2021) (quoting *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014)).

[17]     *Id.* (quoting *Hagen v. Strobel*, 353 P.3d 799, 802 (Alaska 2015)).

[18]     CIFF also argues that state fishery laws are preempted by federal law. But a federal preemption argument was not raised in the superior court, and it is therefore forfeited. *See Brandon v. Corr. Corp. of Am.*, 28 P.3d 269, 280 (Alaska 2001) ("A party

(continued...)

Congress did *not* give Alaska fish resource management authority." CIFF contends that pursuant to the Alaska Statehood Act, the State must manage fish resources in the broad national interest, which CIFF argues requires the State to follow national standards. But this argument has no basis in the historical record.

The administration of Alaska's fish and wildlife resources was a task of the federal government before statehood.[19] But under section 6(e) of the Alaska Statehood Act, the State of Alaska was to receive control of fisheries upon certification that the Alaska Legislature had "made adequate provision for" state management of the resource:

> All real and personal property of the United States situated in the Territory of Alaska which is specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska . . . shall be transferred and conveyed to the State of Alaska by the appropriate Federal agency: *Provided*, That the administration and management of the fish and wildlife resources of Alaska shall be retained by the Federal Government under existing laws until . . . the Secretary of the Interior certifies to the Congress that the Alaska State Legislature has made adequate provision for the administration, management, and conservation of said resources in the broad national interest.[20]

Congress passed the Alaska Statehood Act, including section 6(e), on July 7, 1958,[21] and

---

**18** (...continued)
may not raise an issue for the first time on appeal.").

**19** 104 CONG. REC. 9,488 (1958).

**20** Alaska Statehood Act, Pub. L. No. 85-508, § 6(e), 72 Stat. 339, 340-41 (1958).

**21** *Id.*

Alaska was admitted to the Union as a state on January 3, 1959.[22]

In order to meet the section 6(e) requirement and receive management authority over Alaska fisheries, the Alaska Legislature in April 1959 enacted House Bill 201.[23] The bill contained no substantive fishery rules or regulations — aside from provisions governing licensing and fees — but it did create both the Board of Fish and Game and the position of Commissioner, and it gave the Board the authority to, among other things, "establish[] open and closed seasons and areas for fish and game," "establish[] the means and methods employed in the pursuit, capture, and transport of fish and game," and "investigat[e] and determin[e] the extent and effect of predation and competition among fish and game in Alaska and exercise such control measures as are deemed necessary to the resources of the State."[24]

House Bill 201 was sent to then-Secretary of the Interior Fred Seaton, who, upon reviewing the legislation, "certif[ied] [to Congress] that the Alaska State Legislature ha[d] made adequate provision for the administration, management, and conservation of the fish and wildlife resources of Alaska in the broad national interest."[25] The transfer of management from the federal government to the State therefore took place, effective January 1, 1960.[26]

---

[22]     Proclamation No. 3269, 24 Fed. Reg. 81 (Jan. 3, 1959).

[23]     Ch. 94, art. I, § 1 - art. IV, § 3, SLA 1959.

[24]     Ch. 94, art. I, § 6, SLA 1959.

[25]     Letter from Fred A. Seaton, Secretary of the Interior, to Sam Rayburn, Speaker of the House (Apr. 27, 1959); *see also* Press Release, Sec'y of the Interior, Transfer of Fish and Wildlife Management to Alaska Approved (Apr. 27, 1959).

[26]     Press Release, Sec'y of the Interior, Transfer of Fish and Wildlife (continued...)

Secretary Seaton's certification meant that Alaska, having satisfied the statutory preconditions, received the promised control of its fisheries. That transfer of authority did not, as CIFF appears to argue, include a perpetual state obligation to manage salmon under a national standard.

Our conclusion is supported not only by the plain language of the Alaska Statehood Act but also by legislative history, which shows that Congress did not intend to impose ongoing specific burdens on state management of fisheries, but only to require that Alaska demonstrate the *ability* to perform that management function.

The language requiring the Alaska State Legislature to make "adequate provision for the administration, management, and conservation of said resources in the broad national interest" was introduced by two representatives from the State of Washington, Thomas Pelly and Jack Westland.[27] Representative Pelly explained that the language was provided by conservation groups and was designed to meet their objections to the Alaska Statehood Act.[28] He said that he "favor[ed] the principle of giving the people of Alaska management over their affairs and administration of their resources," but "in transferring the management to the Alaskans," he wanted "reasonable assurance of safeguards to protect the public interest."[29] Representative Pelly explained that "[t]he amendment simply would assure State management and regulation that will uphold and conform to the new proposed constitution of the State of Alaska which provides for

---

[26] (...continued)
Management to Alaska Approved (Apr. 27, 1959).

[27] 104 CONG. REC. 9,410-11, 9,747-50 (1958).

[28] *Id.* at 9,410 (statement of Representative Pelly).

[29] *Id.* at 9,411.

common use of natural resources."[30]

Representative Westland was concerned that at the time of statehood there was "no competent fisheries organization" in Alaska, but he professed a belief that "[g]iven time, as a State, Alaska could doubtless develop an effective fish and wildlife organization."[31] He believed that "present conditions require [that] the administration of the fish and wildlife resources of Alaska be retained by the Federal Government until it can clearly be shown that the Alaska State Legislature has made adequate provision for the administration, management, and conservation of these resources in the broad national interest."[32] But Representative Westland made clear that the proposed language did not impose ongoing burdens: "Let me emphasize that this amendment sets up no bar to future control of these resources by the State of Alaska."[33]

This legislative history confirms Congress's concern about Alaska's lack of its own fisheries management scheme at the time of statehood, but it fails to show any congressional intent that national standards would continue to control once the State effectively took responsibility. Congress's express concerns were met when the Alaska Legislature passed House Bill 201 structuring the Department of Fish and Game and Secretary Seaton certified that the Statehood Act was satisfied: Alaska had met the Act's threshold for asserting state control of fisheries management. The State had no ongoing

---

[30] *Id.* at 9,750. Representative Pelly was referencing article VIII, section 15 of the Alaska Constitution, which read at the time: "No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State." Alaska Const. art. VIII, § 15 (amended 1972).

[31] 104 CONG. REC. 9,748 (1958) (statement of Representative Westland).

[32] *Id.*

[33] *Id.*

commitment under the Alaska Statehood Act to manage that resource in the "broad national interest." We reject CIFF's argument that the "broad national interest" governs Alaska's fisheries management decisions.

### 2. The State was not required to follow national standards in the federal waters of Cook Inlet in 2019 and 2020.

Finding that "[a] national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources,"[34] Congress passed the Magnuson-Stevens Fishery Conservation and Management Act in 1976.[35] The Magnuson-Stevens Act extended federal jurisdiction over ocean waters to 200 miles from shore, an area labeled the "exclusive economic zone."[36] But states retained jurisdiction over the first three miles from shore, and Congress explained that aside from certain specified exceptions, nothing in the act "shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries."[37]

The Magnuson-Stevens Act established eight Regional Fishery Management Councils, with the North Pacific Fishery Management Council responsible

---

[34] 16 U.S.C. § 1801(a)(6).

[35] Fishery Conservation and Management Act of 1976, Pub. L. No. 94-265, 90 Stat. 331 (1976) (codified as amended at 16 U.S.C. §§ 1801-1891d).

[36] 16 U.S.C. § 1801(b)(1); Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983).

[37] 16 U.S.C. § 1856(a)(1).

for managing federal waters off the coast of Alaska.[38] The Act requires each council to "prepare and submit . . . a fishery management plan,"[39] which must "contain the conservation and management measures, applicable to . . . fishing . . . vessels . . . which are . . . consistent with the national standards,"[40] among other requirements.[41]

---

[38]    16 U.S.C. § 1852(a)(1)(G).

[39]    16 U.S.C. § 1852(h)(1).

[40]    16 U.S.C. § 1853(a)(1)(C).  The 10 national standards are:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States.  If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic

(continued...)

In 1979 the North Pacific Fishery Management Council created the first fishery management plan for Alaska.[42]  The Alaska Fishery Management Plan divided Alaska waters into the West Area and the East Area, with the dividing line at Cape

---

[40]     (...continued)
allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

16 U.S.C. § 1851(a).

[41]     16 U.S.C. § 1853(a).

[42]     Fishery Management Plan for the High Seas Salmon; Fishery Off the Coast of Alaska, 44 Fed. Reg. 33,250 (June 8, 1979) (to be codified at 50 C.F.R. pt. 674).

Suckling, approximately 75 miles southeast of Cordova.[43] The West Area was closed to commercial fishing aside from three "historical fisheries managed by the State," which included Cook Inlet.[44]

In 2012 the North Pacific Fishery Management Council adopted Amendment 12, which removed Cook Inlet from the West Area and exempted Cook Inlet from the fishery management plan.[45] The Council believed that "removing the net fishing areas and the sport fishery from the West Area allows the State to manage Alaska salmon stocks and directed fishing for those stocks as seamlessly as practicable throughout their range."[46]

In 2013 the United Cook Inlet Drift Association and CIFF filed suit in federal court challenging the Council's decision to remove Cook Inlet from the fishery management plan as contrary to the requirement that a fishery management plan be prepared "for each fishery under [a council's] authority that requires conservation and management."[47] In 2016, in *United Cook Inlet*, the Ninth Circuit held that the Magnuson-Stevens Act did not permit the National Marine Fisheries Service (NMFS) to remove Cook Inlet from the fishery management plan:

> The Magnuson-Stevens Act unambiguously requires a Council to create [a fishery management plan] for each

---

[43]     *Id.* at 33,255.

[44]     *Id.* at 33,267.

[45]     Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Salmon, 77 Fed. Reg. 75,570 (Dec. 21, 2012) (to be codified at 50 C.F.R. pt. 679).

[46]     *Id.*

[47]     *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837 F.3d 1055, 1060-61 (9th Cir. 2016) (quoting 16 U.S.C. § 1852(h)(1)).

fishery under its authority that requires conservation and management. The Act allows delegation to a state under [a fishery management plan], but does not excuse the obligation to adopt [a fishery management plan] when a Council opts for state management. Amendment 12 is therefore contrary to law to the extent it removes Cook Inlet from the [fishery management plan].[48]

CIFF argues that the Ninth Circuit's ruling in *United Cook Inlet* requires the State to manage salmon resources in federal waters under the ten national standards set out in the Magnuson-Stevens Act. The superior court rejected this argument, determining that there was no fishery management plan for federal waters in Cook Inlet in place during 2019 and 2020 and therefore the State could not have been bound by federal standards:

> While the [Ninth Circuit] made clear that the NMFS must ultimately include the Cook Inlet fishery into [a fishery management plan], and that the [fishery management plan] must follow certain federal standards, the parameters of that [fishery management plan] ha[ve] not yet been finalized. Thus, even if this court were to conclude that the fishery at issue here should be governed by a [fishery management plan] and the corresponding federal standards, this court

---

**48** *Id.* at 1065. In response to the Ninth Circuit's decision, on November 3, 2021 the NMFS issued Amendment 14 to the Alaska Fishery Management Plan, incorporating Cook Inlet into the West Area Fishery Management Plan, effectively prohibiting commercial fishing in the Cook Inlet exclusive economic zone. Fisheries of the Exclusive Economic Zone Off Alaska; Cook Inlet Salmon; Amendment 14, 86 Fed. Reg. 60,568-88 (Nov. 3, 2021) (to be codified at 50 C.F.R. pt. 679). The U.S. District Court for the District of Alaska recently vacated Amendment 14 on grounds that it arbitrarily excluded the recreational salmon fishery from its scope, violated the Magnuson-Stevens Act, and violated a number of the national standards. *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, Nos. 3:21-cv-00255-JMK, 3:21-cv-00247-JMK Consol., 2022 WL 2222879, at *6-16 (D. Alaska June 21, 2022).

could not have required the Board and [Fish and Game] to follow such federal requirements in managing the Cook Inlet fishery in 2019 and 2020, as the NMFS had yet to develop the [fishery management plan] for that fishery.

Under the Magnuson-Stevens Act only a "fishery management plan prepared, and any regulation promulgated to implement any such plan," must conform to national standards.[49] If a fishery management plan delegated fishery management to a state, a state's management could be subject to the national standards, as CIFF argues. But during 2019 and 2020, the years at issue here, Alaska had not been delegated the authority to manage the federal waters of Cook Inlet; the NMFS had *exempted* Cook Inlet from the fishery management plan.[50] Alaska was not bound by the Magnuson-Stevens Act's national standards in federal waters in 2019 or 2020 because there were no federal standards in place at that time.[51] The superior court properly granted summary judgment on this issue.

## B. The Superior Court Did Not Abuse Its Discretion By Limiting The Evidence To The Administrative Record.

CIFF argues that summary judgment should be reversed because the superior court abused its discretion by limiting the evidence to the administrative record

---

[49]  16 U.S.C. § 1851(a).

[50]  *United Cook Inlet*, 837 F.3d at 1060-61.

[51]  CIFF makes a variety of claims against specific management decisions, including those imposing set net restrictions, setting openings and closures, and "abandoning" the 90% maximum sustained yield management standard. We do not address these arguments because either they are predicated on CIFF's argument that federal standards apply, or CIFF has not cited the challenged regulations or an analytical framework for resolving the issue, or both. *See Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062 (Alaska 2005) (explaining that this court does "not consider arguments that are inadequately briefed").

and not allowing further discovery. Given its belief that "salmon fisheries in Cook Inlet are a National resource that must be managed in the broad National interest," CIFF argues that discovery would have revealed that "the State manipulates management of the salmon fisheries adverse to the broad national interest" and that it "does so to favor sport and guided fishing over Upper Cook Inlet commercial fishermen."

As we explain above, the State was not bound by national standards or federal law when managing Cook Inlet, and thus CIFF's belief that discovery would have revealed manipulative management "adverse to the broad national interest" is unavailing. To the extent the remainder of CIFF's claims are predicated on a violation of state law, the administrative record provides the facts material to the dispute.[52]

In a similar case in 2015, CIFF challenged the Fish and Game Commissioner's decision to close the set net fishery while also increasing the drift net fishery time.[53] CIFF argued that it "must be able to conduct discovery to determine the basis for the Department's gross deviation from [the] requirements of . . . management plans and to determine how those deviations were arrived at and who influenced the Department to deviate from them."[54] In deciding the case, "we emphasize[d] that each and every claim and request for relief set forth in CIFF's . . . complaint was predicated on the allegation the Commissioner's actions violated the Board's management plans."[55] We held that CIFF was not entitled to discovery because there were no facts outside the

---

[52]    *See CIFF 2015*, 357 P.3d 789, 797-98 (Alaska 2015).

[53]    *Id.* at 791-92.

[54]    *Id.* at 797 (alterations in original) (quoting CIFF's superior court hearing argument).

[55]    *Id.* at 798.

administrative record that were actually material to its claims:

> The management decisions themselves — the emergency orders, which included the reasons for them — were compiled and presented to the superior court and are the undisputed material facts key to resolving whether, in light of the 2013 king and sockeye runs, the Commissioner's discretionary actions were authorized by the Board's management plans. Accordingly whatever CIFF would have discovered from deposing "past and current . . . department employees" would not have been "essential to justify" CIFF's summary judgment opposition.[56]

We explained that "because the Commissioner's discretionary actions were lawful, there was no need for discovery about who allegedly pressured her to undertake allegedly unlawful actions."[57]

To determine whether discovery beyond the administrative record would have been appropriate, we look to CIFF's original complaint.[58] CIFF asserted that Fish and Game "failed to follow the relevant management plans resulting in significant damage to CIFF members, to the commercial fishing industry in general, and to the salmon stocks." CIFF also alleged that the Board "adopted regulations in 2017 that change historic gear, season, mixed stock pairings, and other gillnet provisions, and

---

[56] *Id.* at 797-98 (alteration in original) (first quoting CIFF superior court argument; and then quoting Alaska R. Civ. P. 56(f)).

[57] *Id.* at 798.

[58] CIFF does not directly challenge the superior court's denial of its motion to file an amended complaint, so we do not consider it. *See Hagen v. Strobel*, 353 P.3d 799, 805 (Alaska 2015) (holding that appellant waived challenge by failing to "cite Alaska Civil Rule 15 or any other legal authority regarding a superior court's discretion in considering a motion for leave to amend a complaint").

directed or allow [Fish and Game] to impose the new restrictions" without "science-based justification and against the recommendations of experienced [Fish and Game] commercial fishing division personnel." CIFF alleged that "[t]he practical effect of the emergency orders issued by [Fish and Game] in 2019 is an impermissible allocation of fishery resources among the user groups, and not merely an unavoidable allocative consequence of a permissible use of the emergency order power."

As in *CIFF 2015*, CIFF's claims in this case are based on violations of state law, alleging that the Commissioner violated the management plans and that the Board adopted invalid regulations. And also as in *CIFF 2015*, "[t]he management decisions themselves . . . were compiled and presented to the superior court and are the undisputed material facts key to resolving whether . . . the Commissioner's discretionary actions were authorized by the Board's management plans."[59] And "whatever CIFF would have discovered from deposing . . . department employees[] would not have been 'essential to justify' CIFF's summary judgment opposition."[60]

We do not mean to imply that discovery must always be limited to the administrative record. But while discovery beyond the administrative record may be appropriate in some cases,[61] CIFF has failed to demonstrate in this appeal that limiting

---

[59] *CIFF 2015*, 357 P.3d at 797-98.

[60] *Id.* at 798 (quoting Alaska R. Civ. P. 56(f)).

[61] *Cf. id.* (noting that CIFF failed to sue Fish and Game Commissioner in personal capacity, which would have made relevant — and by implication discoverable — information whether the Commissioner acted "in bad faith, with malice, or with corrupt motives").

discovery to the administrative record was an abuse of discretion.[62]

CIFF argues that "[d]iscovery has been allowed in other cases against the Department," and cites *Johnson v. Alaska State Department of Fish & Game*[63] as a case in which " 'substantial discovery' was allowed." In *Johnson* a group of Alaska Native surf fishers alleged that Fish and Game discriminated against them on the basis of race by closing the surf fishery by emergency order.[64] One surf fisherman filed a complaint with the Alaska Human Rights Commission, where the "substantial discovery" mentioned in our opinion occurred; discovery was not at issue on appeal.[65] *Johnson* therefore has no bearing on this case. Because the superior court's discovery order was not an abuse of discretion, and CIFF's arguments on the merits are unavailing, we affirm the superior court's grant of summary judgment in favor of the State.

## C. CIFF Forfeited Its Argument That The Alaska-Resident-Only Personal Use Fisheries Are Unconstitutional.

CIFF argues that the "Alaska-resident-only personal use fishery" is unconstitutional as a violation of the federal Commerce Clause,[66] but it does not identify the particular statute or regulation it is challenging. CIFF did not challenge the Alaska-resident-only personal use fishery in its original complaint, and we have searched the

---

[62]    *See Punches v. McCarrey Glen Apartments, LLC*, 480 P.3d 612, 619 (Alaska 2021) ("We will find an abuse of discretion when the decision on review is manifestly unreasonable." (quoting *Sykes v. Lawless*, 474 P.3d 636, 646 (Alaska 2020))).

[63]    836 P.2d 896 (Alaska 1991).

[64]    *Id.* at 903.

[65]    *Id.* at 903-04

[66]    U.S. Const. art. I, § 8.

trial court record in vain for a citation to the law it claims is unconstitutional.[67]

In its reply brief, CIFF asserts that it cited *Hughes v. Oklahoma*,[68] a Commerce Clause case, multiple times and challenged the legality of the Alaska-resident-only personal use fishery before the superior court.[69] But the record reveals only one instance prior to the grant of summary judgment — at the May 2020 oral argument — when CIFF argued that the resident-only personal use fishery was unconstitutional under *Hughes*:

> [T]he board, at the request and the encouragement of the department, appears to have created yet another illegal fishery, Alaska resident-only. We have pointed out before the U.S. Supreme Court case from 1979, *Hughes v. Oklahoma*. It is simply a violation of the United States Constitution to create a resident-only limitation on a fishery.

Given the serious nature of CIFF's assertion — that Alaska has created an unconstitutional fishery — we do not find this passing reference sufficient to hold that CIFF preserved the argument. "We have repeatedly held that '[i]ssues not properly

---

[67]     We assume that CIFF is challenging 5 AAC 77.540. In its opening brief CIFF refers once, without citation, to "[t]he bag limits for the Alaska-resident-only personal use fisheries" and describes limits that are found in 5 AAC 77.540.

[68]     441 U.S. 322 (1979) (holding Oklahoma statute forbidding out-of-state transportation of minnows unconstitutional under Commerce Clause).

[69]     The first time CIFF brought the Alaska-personal-use fishery to the attention of the superior court was in its opposition to summary judgment, when it listed "Is the Alaska-resident only personal use dip net fishery legal?" as an issue of material fact. This vague reference was insufficient to put the court or the State on notice that CIFF was asserting a claim under the Commerce Clause. CIFF also asserts that "[t]his issue was raised in the amended complaint that CIFF lodged with the trial court with a timely motion for leave to amend." But as discussed *supra* note 58, the superior court denied CIFF's motion to amend its complaint, a ruling CIFF does not challenge on appeal.

raised or briefed [before the trial court] are not properly before this court on appeal.' "[70] CIFF did not challenge the constitutionality of the fisheries in its complaint, and it never substantively briefed or argued before the superior court that Alaska's resident-only personal use fisheries violate the Commerce Clause. The argument was not preserved for appellate review.[71]

## V.  CONCLUSION

We AFFIRM the judgment of the superior court.

---

[70]     *Burts v. Burts*, 266 P.3d 337, 344 (Alaska 2011) (first alteration in original) (quoting *Hagans, Brown & Gibbs v. First Nat'l Bank of Anchorage*, 783 P.2d 1164, 1166 n.2 (Alaska 1989)).

[71]     CIFF also forfeited its argument that "[t]he State has a public trust responsibility to manage salmon in Upper Cook Inlet for the benefit of all the people in this Nation — i.e., the broad national interest." CIFF first mentioned the public trust doctrine when opposing the State's motion for entry of final judgment, that is, after the court had ruled for the State on all of CIFF's claims. *See Stadnicky v. Southpark Terrace Homeowner's Ass'n*, 939 P.2d 403, 405 (Alaska 1997) (holding that "[a]n issue raised for the first time in a motion for reconsideration is not timely" and therefore would not be "properly before this court on appeal"); *Hymes v. DeRamus*, 222 P.3d 874, 889 (Alaska 2010) (holding that "a party may not raise an issue for the first time on appeal" (quoting *Brandon v. Corr. Corp. of Am.*, 28 P.3d 269, 280 (Alaska 2001))).

CIFF also asks that the attorney's fees award be reversed and remanded, but its only argument is that "[t]he State should not have prevailed, certainly not on summary judgment." Because we affirm the grant of summary judgment, we do not disturb the attorney's fees award.