NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| COOK INLET FISHERMAN'S FUND, ) <br><br> Appellant, ) <br><br> v. ) <br><br> ALASKA DEPARTMENT OF FISH & ) <br> GAME, ALASKA BOARD OF ) <br> FISHERIES, and COMMISSIONER ) <br> DOUG VINCENT-LANG, in an ) <br> official capacity, ) <br><br> Appellees. ) <br> ) | Supreme Court No. S-19034 <br><br> Superior Court No. 3KN-22-00515 CI <br><br> <u>MEMORANDUM OPINION <br> AND JUDGMENT</u>* <br><br> No. 2116 – October 29, 2025 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Jason M. Gist, Judge.

Appearances: Carl Bauman, Law Offices of Carl Bauman, Soldotna, for Appellant. Aaron C. Peterson, Senior Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

## I. INTRODUCTION

In the summer of 2022, the Alaska Department of Fish and Game (ADF&G) closed a portion of the commercial fishery in Cook Inlet in an effort to

---

\*       Entered under Alaska Appellate Rule 214.

protect the weakening king salmon run, but kept the personal use fishery open. Challengers sued, arguing that this management decision violated the dormant Commerce Clause of the United States Constitution. The superior court granted summary judgment in favor of ADF&G, holding that the management decision did not violate the dormant Commerce Clause. Because the fish harvested in the personal use fishery will never enter a stream of commerce, and because the commercial closures apply equally to residents and non-resident fishing ventures, we hold that ADF&G's management decision does not impermissibly discriminate against interstate commerce and affirm the decision of the superior court.

## II.     FACTS AND PROCEEDINGS

### A.     Background

Cook Inlet Fisherman's Fund (CIFF) is a nonprofit corporation that represents commercial fishing interests in Cook Inlet. This is CIFF's third time before us challenging ADF&G's fishery management decisions.[1]

The Cook Inlet fishery accommodates commercial, sport, personal, and subsistence uses of all five Pacific salmon species — king, coho, sockeye, pink, and chum.[2] ADF&G is "charged with the duty to conserve and develop Alaska's salmon fisheries on the sustained yield principle."[3] The department fulfills this duty by

---

[1]     In *Cook Inlet Fisherman's Fund v. State, Dep't of Fish & Game* (*CIFF I*), 357 P.3d 789 (Alaska 2015), we rejected CIFF's arguments that ADF&G's closure of certain portions of the salmon fishery violated the State's own fishery management plans and the uniform application and sustained yield clauses of the Alaska Constitution. Then in *Cook Inlet Fisherman's Fund v. State, Dep't of Fish & Game* (*CIFF II*), 514 P.3d 1250 (Alaska 2022), we rejected CIFF's argument that Alaska's fishery management was subject to federal standards in 2019 and 2020.

[2]     *CIFF I*, 357 P.3d at 792 ("All five Pacific salmon species make their way through Cook Inlet and into its numerous river systems, including the Kasilof and Kenai Rivers.").

[3]     5 Alaska Administrative Code (AAC) 39.223(a).

establishing management plans for fisheries throughout the state.[4] Two of the department's management plans relating to Cook Inlet are at issue here.

The first is the Kenai River Late-Run King Salmon Management Plan.[5] That plan provides that "[t]he department shall manage the late-run Kenai River king salmon stocks primarily for sport and guided sport uses."[6] The plan also provides that ADF&G "shall" manage the late-run king salmon fishery to "achieve an optimal escapement goal of 15,000 – 30,000" king salmon of a certain size.[7] If the projected king escapement is less than 15,000 of a certain size, then ADF&G is required to close commercial set netting and heavily restrict commercial drift netting at and around the mouth of the Kenai River.[8]

The second plan at issue is the Upper Cook Inlet Personal Use Salmon Fishery Management Plan.[9] Fishing for personal use is defined as "the taking, fishing for, or possession of finfish . . . by Alaska residents for personal use and not for sale or barter."[10] In Cook Inlet, the personal use fishery is accessible only to persons with an Alaska resident sport fishing license.[11] The plan allows residents to dipnet for salmon on the Kenai, Kasilof, Beluga, and Susitna Rivers, and on Fish Creek.[12] Most kings

---

[4] *See, e.g.*, 5 AAC 21.353-.377 (providing various salmon fishery management plans for regions throughout Alaska, including Cook Inlet).

[5] 5 AAC 21.359.

[6] 5 AAC 21.359(a).

[7] 5 AAC 21.359(b).

[8] 5 AAC 21.359(d).

[9] 5 AAC 77.540.

[10] AS 16.05.940(27).

[11] 5 AAC 77.540(a)(1).

[12] 5 AAC 77.540(c)-(d), (g)-(h).

may not be retained and any kings caught while fishing for other species (bycatch) must be released.[13]

### B.     The 2022 Commercial Closures

The king salmon population in the Kenai River has been suffering.[14]   In January 2022, ADF&G projected that the late king run in the Kenai would consist of 16,004 fish — only 1,004 fish above the minimum escapement goal.[15]   Because of this, the commissioner of ADF&G required sport fishers on the Kenai to use only "one unbaited, single-hook, artificial lure" and prohibited sport fishers from retaining "king salmon of any size while sport fishing through July 31, 2022."

Then in March 2022, the department published an advisory announcement entitled *Upper Cook Inlet 2022 Outlook For Commercial Salmon Fishing*.   The announcement stated that ADF&G's sockeye escapement forecasts were well above its sustainable escapement goals for that species.   And the announcement explained that from July 9 through July 15, portions of the commercial fishery would be closed on the weekends to "facilitate movement of fish into the rivers for the personal use fishery."

However, on June 3, 2022, ADF&G issued an emergency order restricting commercial set gillnet fishing near the mouth of the Kenai to "no more than 24 hours per week" to ensure that the king salmon run achieved its escapement goal of 15,000 – 30,000 kings.[16]   Then effective July 17, 2022, the commissioner completely closed the

---

[13]     *See id.*

[14]     *See CIFF II*, 514 P.3d 1250, 1252-53 (Alaska 2022) (describing 2019 outlook for late king run as "well below average"); *see also CIFF I*, 357 P.3d 789, 792 (Alaska 2015) (describing 2013 early king run in Kenai River as "possibly the lowest on record" and late run as "the lowest on record").

[15]     *See* 5 AAC 21.359(b) (setting optimal escapement goal for late-run kings in Kenai River at "15,000 – 30,000" fish).

[16]     *See* 5 AAC 21.359(e)(3)(C) (providing that "if the use of bait retention of king salmon are prohibited in Kenai River sport fishery," then commercial set gillnet fishing in Upper Subdistrict shall be open "for no more than 24 hours per week").

Kenai River king sport fishery, prohibiting even catch-and-release of the fish, due to projections that the late king run would be far below the optimal escapement goal of 15,000.[17] This action also triggered the closing of "the commercial drift gillnet fishery in the Central District" and the "commercial set gillnet fishery in the Upper Subdistrict and the Central District"[18] near the mouth of the Kenai River pursuant to the Kenai River Late-Run King Salmon Plan.

### C.    The 2022 Complaint

In light of these closures, CIFF filed a complaint and a motion for a preliminary injunction in Kenai Superior Court, arguing that ADF&G's implementation of the Kenai River Late-Run King Salmon Plan violated the dormant Commerce Clause of the Constitution.  CIFF argued that ADF&G's commissioner was using the plan "to severely and adversely disenfranchise commercial fishing interests" by closing "the East side set net fishery for the remainder of the season at or before the peak of the Sockeye run."  It argued that this decision saved "a few hundred King salmon" while "allowing gross Sockeye and pink salmon over escapements of over a million salmon into the Kenai, Kasilof, and other Cook Inlet rivers that should have been harvested." CIFF maintained that this decision "caused great unnecessary harm to the fishermen, processors, local economies, national interest, salmon, salmon habitat, and national food supply."  CIFF also argued that the Upper Cook Inlet Personal Use Salmon Fishery Management Plan was unconstitutional, contending that the fishery impermissibly

---

[17]    *See* 5 AAC 21.359(d)(1) (requiring ADF&G to close Kenai sport fishery if escapement projection for late-run kings is less than 15,000 fish).

[18]    *See* 5 AAC 21.359(d)(2)-(3) (requiring ADF&G to "close the commercial drift gillnet fishery in the Central District within one mile of the Kenai Peninsula shoreline north of the Kenai River and within one and one-half miles of the Kenai Peninsula shoreline south of the Kenai River" and also requiring ADF&G to completely "close the commercial set gillnet fishery in the Upper Subdistrict of the Central District" when escapement projection for late-run kings is less than 15,000 fish).

discriminated against interstate commerce because a user must have an Alaska resident fishing license in order to access the fishery.

**D.    Superior Court Proceedings**

In January 2023, CIFF filed a motion for partial summary judgment on its constitutional claim.[19]  ADF&G opposed and filed its own cross-motion for summary judgment.

After hearing argument, the superior court granted ADF&G's cross-motion in February 2024.  The court concluded that the personal use fishery did not "facially discriminate" against interstate commerce, and any incidental effect that the Upper Cook Inlet commercial closures had on interstate commerce was insignificant. ADF&G subsequently moved for attorney's fees and entry of final judgment, which the court granted.

CIFF appeals.

---

[19]    Before granting summary judgment to ADF&G on CIFF's dormant Commerce Clause claim, the superior court had dismissed the entirety of CIFF's case on grounds of issue and claim preclusion.  After dismissing the case, though, the court granted CIFF's motion for reconsideration as to its dormant Commerce Clause claim, determining that CIFF did not have a " 'full and fair opportunity' to previously litigate the constitutionality of the personal use fishery."  The court denied reconsideration of all other claims that had been dismissed.

CIFF's only discernable argument on appeal is that the superior court erred by granting summary judgment to ADF&G on its dormant Commerce Clause claim.  To the extent that CIFF intended to argue that it was error to grant ADF&G's motion to dismiss, that argument is waived due to inadequate briefing.  *See Baseden v. State*, 174 P.3d 233, 243 (Alaska 2008) (explaining that "[b]ecause the issue is not adequately briefed, it is waived").

## III. STANDARD OF REVIEW

Whether a state action is constitutional is a question of law.[20] We review questions of law de novo, "adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[21]

We also review orders granting summary judgment de novo, and will affirm such an order "if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law."[22]

We review attorney's fee awards for abuse of discretion, and will only find such an abuse if "the award was arbitrary, capricious, manifestly unreasonable, or stemmed from an improper motive."[23]

## IV. DISCUSSION

### A. ADF&G's Closure Of Portions Of The Commercial Fishery In Cook Inlet While Keeping Open The Resident-Only Personal Use Fishery Does Not Violate The Dormant Commerce Clause.

CIFF contends that ADF&G violated the dormant Commerce Clause when it closed portions of the Cook Inlet commercial fishery pursuant to the Kenai River Late-Run King Salmon Management Plan but kept the personal use fishery on the Kenai open. But the fish harvested in the personal use fishery will never enter the stream of commerce, and the commercial closures in Cook Inlet apply to residents and non-residents alike. Therefore, the superior court properly granted summary judgment in ADF&G's favor.

---

[20] *Pullen v. Ulmer*, 923 P.2d 54, 58 (Alaska 1996) (citing *Croft v. Pan Alaska Trucking, Inc.*, 820 P.2d 1064, 1066 (Alaska 1991)).

[21] *CIFF II*, 514 P.3d 1250, 1255 (Alaska 2022) (quoting *Smith v. State*, 282 P.3d 300, 303 (Alaska 2012)).

[22] *Id.* (quoting *Creekside Ltd. P'ship v. Alaska Hous. Fin. Corp.*, 482 P.3d 377, 382 (Alaska 2021)).

[23] *CIFF I*, 357 P.3d 789, 797 (Alaska 2015) (quoting *Bush v. Elkins*, 342 P.3d 1245, 1251 (Alaska 2015)).

1. **ADF&G's management of the personal use fishery does not implicate the dormant Commerce Clause because the fish harvested in the fishery cannot be bartered or sold.**

The Commerce Clause grants Congress the power to "regulate Commerce . . . among the several States."[24] The dormant Commerce Clause is a doctrine that "prevents the States from adopting protectionist measures" and is intended to "preserve[] a national market for goods and services."[25] This means that States may not "seek to 'build up . . . domestic commerce' through 'burdens upon the industry and business of other States.' "[26] In order to successfully mount a dormant Commerce Clause challenge, a party must first identify a commercial article or activity impacted by the state action challenged.[27]

Here, the Upper Cook Inlet Personal Use Fishery is restricted to Alaska residents.[28] But by definition, the fish caught for personal use cannot be bartered or sold.[29] The fish never enter the stream of commerce or otherwise become an article of

---

[24] U.S. Const. art. I, § 8, cl. 3.

[25] *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019) (citing *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)). Dormant Commerce Clause doctrine was first set forth by Chief Justice John Marshall, *see Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824), and remains good law today. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370-71 (2023).

[26] *Nat'l Pork Producers Council*, 598 U.S. at 369 (alteration in original) (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)).

[27] *See United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (stating Congress may regulate "three broad categories of activity" under the Commerce Clause: "the use of the channels of interstate commerce[,] . . . the instrumentalities of . . ., or persons or things in interstate commerce," and "those activities that substantially affect interstate commerce" (citations omitted)); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 550 (2012) ("The power to *regulate* commerce presupposes the existence of commercial activity to be regulated." (emphasis in original)).

[28] AS 16.05.940(27); *see also* 5 AAC 77.540(a)(1).

[29] AS 16.05.940(27).

commerce. CIFF attempts to circumvent this fact by pointing to "substantial monetary awards to commercial fishermen and others in the *Exxon Valdez* and *Glacier Bay* oil spill lawsuits." CIFF suggests that because commercial fishermen were financially compensated when wild salmon were destroyed in oil spill disasters, we should view the suspension of certain commercial fishing activity in Cook Inlet as implicating "commerce."

But this argument is undermined by the reasoning of our decision in *Shepherd v. State, Department of Fish & Game*,[30] and by the United States District Court for the District of Alaska's decision in *Jensen v. Locke*.[31] In *Shepherd*, we held that a statute requiring the Board of Game to give preference in the taking of moose and other large game to Alaska residents for personal or family consumption did not implicate the dormant Commerce Clause.[32] Hunting guides whose clients were primarily nonresidents sued the State, arguing that the resident preference facially discriminated against interstate commerce.[33] The issue there was whether unharvested game is an article of commerce subject to Congress's constitutional commerce powers.[34] We first cited the United States Supreme Court's decision in *Toomer v. Witsell* in support of the proposition that "unharvested game is not an article of interstate commerce."[35] Then we considered several federal district court decisions in which

---

[30] 897 P.2d 33, 42 (Alaska 1995).

[31] No. 3:08-cv-00286-TMB, 2009 WL 10674336, at *12-14 (D. Alaska Nov. 9, 2009).

[32] *Shepherd*, 897 P.2d at 41-43.

[33] *Id.* at 35, 41.

[34] *Id.* at 41-43.

[35] *Id.* at 41-42 (citing *Toomer v. Witsell*, 334 U.S. 385, 394-95 (1948)). In *Toomer*, the Supreme Court held that a South Carolina law that imposed a one-eighth cent tax on each pound of shrimp harvested by commercial shrimpers in state waters

those courts "expressly found that unharvested game is not an article of commerce for Dormant Commerce Clause purposes."[36] After examining these authorities we reasoned that it was "particularly clear" that "unharvested game is not an article of commerce . . . where the game, after its taking, is still not destined for interstate commerce."[37] And we concluded that because Alaska law forbade the sale or purchase of moose, the resident moose-hunting preference did not touch a commercial article or activity subject to the dormant Commerce Clause.[38]

Then in *Jensen*, challengers argued that Alaska's personal use fishing regulations discriminated against interstate commerce.[39] The court rejected this argument, noting that by definition, fish caught for personal use could not be bartered or sold.[40] The court thus concluded that restricting access to the personal use fishery based on residency did not "affirmatively discriminate against interstate commerce."[41]

Like the game and fish at issue in those cases, the salmon caught in the personal use fishery are only ever destined for personal use; they may not be bartered

---

did not "discriminate against interstate commerce in shrimp" because "the taxable event, the taking of shrimp, occurs before the shrimp can be said to have entered the flow of interstate commerce." *Toomer*, 334 U.S. at 394-95.

[36] *Id.* at 42 (summarizing *Terk v. Ruch*, 655 F. Supp. 205, 215 (D. Colo. 1987), and *Tangier Sound Watermen's Ass'n v. Douglas*, 541 F. Supp. 1287, 1306 (E.D. Va. 1982)).

[37] *Id.* (citing *Hicklin v. Orbeck*, 437 U.S. 518, 533 (1978)).

[38] *Id.* (citing AS 16.05.920(a), which provides that unless otherwise permitted by law, "a person may not . . . transport, sell, offer to sell, purchase, or offer to purchase . . . game . . . or any part of . . . game").

[39] No. 3:08-cv-00286-TMB, 2009 WL 10674336, at *12-14 (D. Alaska Nov. 9, 2009).

[40] *Id.* at *12 (citing former AS 16.05.940(25) (2008), *currently renumbered as* AS 16.05.940(27) defining "personal use fishing" as "the taking, fishing for, or possession of finfish . . . by Alaska residents for personal use and not for sale or barter").

[41] *Id.*

or sold.[42]  This is therefore one of those "particularly clear" situations in which interstate commerce is not implicated.[43]  Because the wild salmon caught in the personal use fishery will never enter a stream of commerce, CIFF cannot successfully challenge ADF&G's management of the fishery under the dormant Commerce Clause.

> **2.      ADF&G's closure of portions of the Cook Inlet commercial fishery pursuant to the Kenai River Late-Run King Salmon Management Plan also does not violate the dormant Commerce Clause.**

CIFF also contends that ADF&G's closure of portions of the Cook Inlet commercial fishery pursuant to the Kenai River Late-Run King Salmon Management Plan is actually a subtle attempt to discriminate against out-of-state commercial fishing interests.  CIFF cites *Hughes v. Oklahoma*[44] as supportive of its argument.  There, the Supreme Court applied a balancing test for determining whether a state action discriminated against interstate commerce.[45]  That test required the court to consider:

> (1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.[46]

In *Hughes*, the Court considered an Oklahoma law that prohibited natural minnows harvested within Oklahoma from being transported outside the state for sale.[47]

---

**42**      AS 16.05.940(27).

**43**      *Shepherd v. State, Dep't of Fish & Game*, 897 P.2d 33, 42 (Alaska 1995).

**44**      441 U.S. 322 (1979).

**45**      *Id.* at 336 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

**46**      *Id.* (citing *Pike*, 397 U.S. at 142).

**47**      *Id.* at 336-37.

Oklahoma argued that the law was intended to prevent the "depletion of minnows in Oklahoma's natural streams through commercial exportation."[48]

Applying the balancing test, the *Hughes* Court held that the Oklahoma law discriminated on its face against interstate commerce by forbidding the movement of natural minnows for sale out of the state.[49] The Court stated that Oklahoma's "interest in maintaining the ecological balance in state waters by avoiding the removal of inordinate numbers of minnows may well qualify as a legitimate local purpose."[50] But it also held that Oklahoma had made no effort to show that the law was the "least discriminatory" means of conserving Oklahoma's minnows.[51] Therefore, the Court struck down the law as "repugnant to the Commerce Clause."[52]

Here, unlike the law at issue in *Hughes*, ADF&G's closure of portions of the Cook Inlet commercial fishery did not discriminate against interstate commerce.[53] Rather, the commercial closures applied equally to resident and nonresident commercial fishing ventures. Still, CIFF argues that the closures, paired with "the Alaska-resident-only PU [personal use] Fishery[,] . . . overtly discriminate[s] against interstate commerce." It characterizes ADF&G's commercial closures as an attempt to

---

[48]     *Id.* at 325 (quoting *Hughes v. State*, 572 P.2d 573, 575 (Okla. Crim. App. 1977)).

[49]     *Id.* at 336-37.

[50]     *Id.* at 337.

[51]     *Id.* at 337-38.

[52]     *Id.* at 338.

[53]     We observe that the test announced in *Pike* and applied in *Hughes* was the subject of a recent Supreme Court plurality opinion in *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023). While the opinion was "fractured" over the state of the Court's dormant Commerce Clause analysis, at least six justices still agreed to "affirmatively retain the longstanding *Pike* balancing test for analyzing dormant Commerce Clause challenges to state economic regulations." *Id.* at 403 (Kavanaugh, J., concurring).

"to put more fish in the rivers for the PU fishery and thereby increase the harvest in the PU fishery."

But CIFF's reasoning stretches the dormant Commerce Clause too far. ADF&G implemented commercial closures required by the Kenai River Late-Run King Salmon Management Plan in an effort to "ensure an adequate escapement of late-run king salmon into the Kenai River."[54] CIFF attempts to rebut ADF&G's stated purpose for the closures by latching onto one line in ADF&G's *Upper Cook Inlet 2022 Outlook For Commercial Salmon Fishing* advisory announcement. There, the department indicated that commercial fishing would be closed on weekends "to facilitate movement of fish into the rivers for the personal use fishery." But this was not ADF&G's explanation for shutting down portions of the commercial fishery mid-season; rather, this was ADF&G's explanation as to why, absent emergency orders, the commercial fishery would be closed on weekends in July.

Aside from the above-described line taken out of context, CIFF fails to make any meaningful argument about how ADF&G's management of the Cook Inlet commercial fishery discriminates against interstate commerce. When a state law "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed . . . is clearly excessive in relation to the putative local benefits."[55] Here, the closure of the commercial fishery imposes no burden on interstate commerce that is not also imposed on intrastate commerce. And any incidental effect the closures have on interstate commerce is not "clearly excessive" in relation to the benefit of avoiding king

---

[54] 5 AAC 21.359(a) (stating that purpose of Kenai River Late-Run King Salmon Management Plan is "to ensure an adequate escapement of late-run king salmon into the Kenai River system").

[55] *Hughes*, 441 U.S. at 331 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

salmon bycatch and protecting the weak king salmon run into the Kenai River.  Where ADF&G was entitled to judgment as a matter of law, the superior court appropriately granted summary judgment.[56]

B. **The Superior Court's Award Of Attorney's Fees To ADF&G Was Within Its Discretion.**

The superior court awarded attorney's fees to ADF&G under Alaska Civil Rule 82(b) for work done on matters unrelated to CIFF's dormant Commerce Clause challenge.[57]  CIFF's argument regarding this award boils down to a brief assertion that allowing ADF&G to bill for two attorneys to prepare for and travel to Kenai from Anchorage for a hearing in July 2022 was "excessive and exorbitant."  But we see no abuse of discretion in the superior court's treatment of the involved attorney time.

Two attorneys billed time for ADF&G in this matter.  The more senior attorney, who argued at the July hearing, billed 22.5 hours for work and travel in relation to the hearing, while the junior attorney billed 14.9 hours on the same matter.  Given the nature of CIFF's claims and the superior court's "broad discretion in calculating

---

[56]  CIFF also argues that the superior court erred by granting summary judgment to ADF&G "with no discovery."  ADF&G asserts that CIFF did not make "a single discovery request" during the life of the case, and nothing in the record indicates any attempt by CIFF to seek a continuance to enable it to conduct discovery after the superior court agreed that it could litigate its constitutional challenge to the regulations.  We review a claim not raised before the superior court for plain error, which requires a showing that "an obvious mistake has been made."  *McCavit v. Lacher*, 447 P.3d 726, 731-32 (Alaska 2019) (quoting *Lindbo v. Colaska, Inc.*, 414 P.3d 646, 652 (Alaska 2018)).  Here, CIFF never requested or argued for discovery while the case was pending before the superior court, and CIFF fails to identify particular discovery that would have been determinative of relevant issues.  The superior court's dismissal of CIFF's claims on summary judgment without sua sponte ordering that further discovery be conducted was not obviously mistaken.

[57]  *See supra* note 19.

awards of attorney's fees,"[58] we conclude that the court did not abuse its discretion by allowing ADF&G to bill for both attorneys' work related to the July 2022 hearing.

## V.    CONCLUSION

We AFFIRM the superior court's grant of summary judgment and award of attorney's fees to ADF&G.

---

[58]    *Valdez Fisheries Dev. Ass'n v. Froines*, 217 P.3d 830, 832 (Alaska 2009).